**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Carl D. WEHLING, Defendant-Appellant.**

No. 80–2383.

United States Court of Appeals,
Fifth Circuit.

May 24, 1982.

Rehearing and Rehearing En Banc
Denied July 26, 1982.

---

Edward J. M. Schroeder, II, Joel W. Westbrook, San Antonio, Tex., for defendant-appellant.

William C. Bryson, Appellate Chief, Patty Merkamp Stemler, Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before DYER *, SAM D. JOHNSON and WILLIAMS, Circuit Judges:

DYER, Circuit Judge:

Following a jury trial Wehling was convicted on twenty four counts of making false claims to a federal agency, HEW, in violation of 18 U.S.C. § 287; twelve counts of converting HEW funds to his own use in violation of 18 U.S.C. § 641; and one count of conspiracy to commit those offenses in violation of 18 U.S.C. § 371. He was acquitted on one count of obstructing justice by attempting to influence a grand jury in violation of 18 U.S.C. § 1503.

On appeal, Wehling raises five issues, i.e., the refusal to give requested instructions on intent; the exclusion of evidence; the sufficiency of the evidence; pre-indictment delay; and denial of access to grand jury minutes. We affirm.

Between 1971 and 1974, Wehling owned and operated over a dozen proprietary schools in Texas, most of which offered courses in secretarial services. Wehling and a cadre of salesmen induced students to enroll at his schools by promising them federal student financial assistance, often erroneously described as grants rather than as loans. Each school represented itself as a Texas corporation even though several were never incorporated, many lost their state charters for failing to pay state franchise taxes, and the persons named as directors often never knew they held that position and always had no voice in the operation of the schools.

The schools were poorly run and often short of equipment, such as typewriters or computers, necessary for certain classes. Students were often overqualified, and thereby received more federal funding than necessary, or underqualified, and thereby should have been ineligible for any federal funding. Many students became disenchanted with the teaching and facilities at Wehling's schools and dropped out during the semester. Those who completed the course of studies found that the jobs Wehling had promised they would have upon graduation were not to be found. Many students, consequently, defaulted on their federal loans.

Wehling controlled all of the finances for the schools from a central office that he operated under the name of Southwestern Education System (SES). All income to the schools in the form of tuition, book sales, and federal funds was sent to SES, as were all bills and tuition refund requests.

The majority of Wehling's students funded their tuition with federal funds from federal block grants to the schools for needy students, the Federally Insured Student Loan (FISL) Program, and other federal sources of money. Under those programs, HEW could offer a student financial assistance in the form of a grant, a loan, or work-study funding. In each case, the money was to be distributed to the student through the school under a strictly regimented set of rules to ensure that the student received the money as long as but no longer than he was eligible, and to ensure that the school did not commingle these funds with the school's own funds or reap financial benefits from serving as the conduit for these funds. For example, eligible schools could not use the federal grant funds for any purpose other than to assist needy students and any interest earned by the federal funds prior to disbursement to the eligible students was to belong to the fund and not the school. There were reporting requirements for the students and the schools under the federal loan programs, particularly with regard to a stu-

---

* Circuit Judge for the Eleventh Circuit, sitting by designation.

dent's leaving school. These limitations and requirements were spelled out in the contracts between HEW and the recipient schools, in the student award letters, and in the applicable federal regulations. In case of a default, HEW repaid the lending institution the amount of the default.

Under standard procedure, a student wishing to use FISL funding to finance his education would apply for such a loan with a local bank. The school in which he was enrolled would then certify him as a student in good standing and the bank would forward the application to HEW. If HEW approved the loan, the bank could disburse the money to the student who would then sign a promissory note for repayment and a statement explaining the finance charges.

Wehling operated the FISL program differently. Students did not deal directly with a bank. Instead, they signed blank FISL applications and promissory notes. Wehling's schools then processed the applications with several banks who would process the applications in large quantities. To induce the banks to do so, he agreed to deposit the school's federal and operating funds with the banks and also paid them a "commission" for the transaction. Wehling would deliver the applications to the banks already stamped with HEW's approval even though HEW often had not done so. Without waiting for formal approval from HEW, the bank would immediately issue 60% of the money to the school rather than to the student in the form of a commercial loan. When HEW approved the loan, the bank would disburse 70% of the loan amount to the school, so that Wehling could repay his loan, and keep the remainder. In this fashion, Wehling generated over 4,000 loans in an amount in excess of $4,000,000.

Under HEW regulations, a school must keep accurate attendance records and must notify the appropriate lending institution once a student graduates, drops out, or is terminated because a student must begin to repay his loan nine months after completion of his studies. In addition, a student is entitled, under HEW regulations, to a partial tuition refund should he leave school before the end of the semester. The schools failed to follow these regulations. They falsified student attendance records and failed to refund tuition money when a student left before the close of a semester. As the result, HEW was forced to pay interest on the loan during the period that the student was not in session, and, in the case of defaulting students, was forced to pay whatever loan amount that the student would have received had he properly obtained a refund.

Using a number of bank accounts, Wehling transferred the federal grant money from school to school, mixing it with school's funds and his personal accounts. Although the schools were operated at a loss, the schools paid Wehling large dividends and paid SES, Wehling's corporate alter ego, substantial management fees for handling their finances.

The schools often converted money obtained from the federal government to their own use to pay school or personal expenses.

When the schools closed they owed enormous sums of unpaid refunds. In a civil suit brought by the State of Texas, a judgment was entered against Wehling for unpaid refunds totalling over $900,000.00. Of course, the unpaid refunds generated inflated and fictitious default claims against HEW.

██ Wehling's first assignment of error is that the district court refused to give two requested charges over his objection. The first charge read:

(a) The Government may not actively mislead someone by authoritatively assuring him that certain conduct is proper, and then prosecute him for that action. If you find that the Government did, in fact, mislead the Defendant with respect to the use of grants in aid, then you are instructed to return a verdict of not guilty on the counts charged wherein the Government gave such misleading statements or advice.... You are further instructed that you may con-

sider the statements made by autho-rized Government officials coming to the attention of Defendant indicating that his handling of the grant funds was authorized as evidence bearing on the question of whether or not the Defendant possessed the requisite criminal intent, which the Government must prove beyond a reasonable doubt.

The second proposed instruction was a standard specific intent charge to which the following sentence was appended:

> (b) Such [specific] intent may be determined from all facts and circumstances surrounding the case, including any assertions made by the Government that the Defendant's conduct was authorized, any acts by the Defendant which would tend to evidence his lack of criminal intent, and all other circumstances surrounding the case.

Wehling argues that he relied upon a defense that he reasonably believed that HEW had authorized the financial practices he followed and therefore never intended to defraud the Government.

A jury instruction reflecting the accused's theory of defense must be given only when "there is an evidentiary foundation for the defense and the defense would be legally sufficient to warrant an acquittal if believed by the jury". *United States v. Grapp*, 653 F.2d 189, 195 (5th Cir. 1981); *United States v. Parker*, 566 F.2d 1304, 1306 (5th Cir. 1978) *cert. denied* 435 U.S. 956, 98 S.Ct. 1589, 55 L.Ed.2d 808 (1978).

There was no evidence introduced demonstrating that Wehling was authoritatively assured by a government official that the conduct underlying the charged offenses was legal. Wehling was prosecuted for failing to make tuition refunds, for filing inflated default claims on federally insured student loans, and for converting federal student grant and loan funds to his own use. Wehling introduced no evidence to show that any government official approved his actions in these respects and there was substantial evidence that Wehling had been informed his conduct was unlawful and that Wehling realized this himself.

The only arguably relevant evidence was an alleged statement to Wehling by Leo Hatten, the HEW regional director, that Wehling could stamp FISL loan applications as approved before HEW issued its final approval. However, not only did Wehling not call Hatten to testify, the subject matter of Hatten's putative testimony is not relevant to the three types of crime charged against Wehling. We conclude that there was no evidentiary support for Wehling's proposed jury instructions and the district court properly refused them.[1]

■ At trial, Wehling sought to introduce an interdepartmental government memorandum containing the following sentence:

> Contrary to popular belief among the proprietary schools of this region, the [Guaranteed Student Loan] program is not intended to provide gifts of funds to educational institutions for use as they see fit without being held accountable for those funds.

The district court refused to permit Wehling to introduce this memorandum.

Wehling contends that this memorandum would have buttressed his defense that he believed his actions had been authorized by the government. This memo, he argues, would have shown that other schools acted in the same manner as he did, and that they too believed they were acting properly. We disagree.

The comment, which appears to be more facetious than authoritative, suggests, if anything, that proprietary school owners in Texas have been violating the law, in the author's view. A warning to Wehling that he was violating the law, if in fact he relied

---

1. In view of our holding that Wehling's defense theory instruction was properly rejected because of the insufficiency of evidence to support it, we need not consider the government's further arguments that the proposed charge, based upon reliance upon the advice of others as a defense to the crimes charged, was erroneous as a matter of law.

on it, can hardly serve as a basis for committing a crime.

Wehling next argues that the evidence was insufficient to prove each type of charge against him beyond a reasonable doubt. He attacks the conspiracy conviction on the ground that there was no showing that he had a specific intent to violate the law. He admits that the meetings and conversations alleged by the government between himself and the unindicted co-conspirators took place, but disputes that the inference of a conspiracy can be drawn from those meetings.

Underlying all of his arguments that the evidence was insufficient to support his convictions for making false claims upon HEW is that there was no showing that he was involved in the transaction in question. He submits that he cannot be held accountable for the illegal actions of subordinates because he was entitled to presume that they were acting lawfully. In fact, he says that he discharged every employee whom he discovered had acted dishonestly. Moreover, he never filled out any of the forms at issue. He claims that the students were responsible for informing the schools, and not him, of their withdrawal from school, and the students, not he, filled out all of the FISL applications. In addition, the banks, not he, sent the inflated interest statements to HEW for payment. There was, therefore, insufficient evidence to connect him to any of the false claims.

In like manner, he contends that the evidence was insufficient to support his convictions for converting HEW funds to his own use on the ground that he did not have the specific intent to wrongfully appropriate the funds. He argues that the federal regulations were unclear on this point and he believed he could use these funds to keep his schools afloat so long as he kept accurate records of the transactions so that HEW could trace its funds into his accounts.

Finally, Wehling asserts as to all these types of crimes that his good faith belief that his conduct had been approved by HEW eliminates any inference of unlawful intent; that his demonstrated good faith to operate the program in a manner in accordance with the goals of the student grant and student loan program, i.e., to assist needy students finance their education, likewise rebuts any inference of malevolence; and that character evidence purporting to demonstrate that he would not have committed fraud was unrebutted.

■ We are unpersuaded by Wehling's arguments. Viewing the evidence in the light most favorable to the government, *United States v. Glasser,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Avarello,* 592 F.2d 1339, 1349 n. 16 (5th Cir. 1979) it is quite clear that Wehling acted in concert with other persons to carry out the schemes to submit false claims and to convert unused student funds. Whether the undisputed actions of Wehling and others gives rise to an inference of conspiratorial purpose is a jury question, and the evidence supports the inference that the jury drew.

■ The evidence also supports Wehling's conviction for submitting false claims to HEW. There is ample evidence that Wehling knew of the recruiting practices of his subordinates and of the falsification of FISL applications. Moreover, whether he in fact knew of the practices is irrelevant. He was charged with submitting false claims for federal funds on accounts for which students should have received tuition refunds. He clearly knew that he did not reimburse the students because he was paying himself, through his SES front, large dividends from his investment of the money that should have been refunded to the students. His argument that the banks, not he, submitted the inflated interest demands is irrelevant because the failure to refund the student's money caused the inflated interest demands. The failure to refund the money, not the making of inflated interest demands, was the gravaman of the charges.

■ The evidence also supports the jury's verdict as to the conversion counts. Wehling's argument that he kept accurate accounting records misses the point. He

was charged with wrongfully converting unallocated student funds, not allocated student funds. The accuracy of his bookkeeping with regard to the latter monies is irrelevant.

Finally, the good faith evidence Wehling introduced at trial was rejected by the jury. It was their province to resolve conflicting evidence and to assess the credibility of witnesses. *United States v. Palacios*, 612 F.2d 972, 973 (5th Cir. 1980); *United States v. Gordon*, 580 F.2d 827, 835 (5th Cir. 1978), *cert. denied* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978).

█ Wehling next urges that the pre-indictment delay of about six years was fatal to the indictment and it should therefore have been dismissed. He argues that this delay creates a presumption that he was prejudiced which the government must, but did not, rebut. This is simply incorrect. As we recently said in *United States v. Hendricks*, 661 F.2d 38 (5th Cir. 1981) "[s]tatutes of limitation provide the primary guarantee against bringing overly stale criminal charges. *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). Thus, preindictment delay rarely constitutes grounds for dismissal. The Due Process Clause of the Fifth Amendment requires dismissal only when the delay 'caused substantial prejudice to [defendant's] rights to a fair trial and . . . was an intentional device to gain tactical advantage over the accused.' *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971); *United States v. Nixon*, 634 F.2d 306, 310 (5th Cir. 1981); *United States v. Ramos*, 586 F.2d 1078, 1079 (5th Cir. 1978)". (Footnote omitted).

█ In an effort to demonstrate actual prejudice Wehling relies on several factors. First, he claims that extensive media publicity prejudiced his ability to defend himself against the charges because it ruined his social connections and he suffered financial reverses as a result of his creditors reluctance to repay their debts until his trial was completed. This argument is unavailing because the "prejudice" he must demonstrate is some impairment of his ability to defend against the governments' charges, not hardship accompaning his prosecution. *United States v. Marion*, 404 U.S. 307, 320–323, 92 S.Ct. 455, 463, 30 L.Ed.2d 468. It is significant that Wehling made no claim that the jury was contaminated.

Next Wehling contends that several witnesses were unable to recall certain facts. Dr. Cromwell, a government witness, was unable to remember the requirements for obtaining federal funds from the Supplemental Education Opportunity Grant Program. But Dr. Cromwell's memory lapse came during defense cross-examination on general, background areas unrelated to the specifics of this case. Texas Assistant Attorney General Goodwin could not recall telling Wehling that it was not a crime to pay refunds. He testified that he was not concerned with the criminal aspects of the case. In any event, the question he was asked was not relevant since the failure to pay refunds was not predicated on the conversion of funds. While Hart, Executive Director of the National Accrediting Committee for Business Schools died prior to trial, there was no showing that his testimony would have been relevant or exculpatory. Wehling further points out that the records of one of his schools was lost. Actually, they were destroyed in 1976 when the crimes for which Wehling was prosecuted were completed. Moreover, there was no showing of their relevance or materiality. Finally, Wehling claims error because the government did not introduce an HEW expert from region six, the region in which all of Wehling's schools were located, because the government could not obtain one owing to the lapse of time. This is unpersuasive because the federal student aid programs are administered uniformally nationwide so an expert from any region is as good as another. As indicated, we find Wehling's arguments meritless. "This Court has held consistently that general allegations of loss of witnesses and failure of memories are insufficient to establish substantial prejudice. *United States v. Ramos*, [supra] 586 F.2d at 1079; *United*

*States v. Avalos*, 541 F.2d 1100, 1108 (5th Cir. 1976) *cert. denied* 430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d 363 (1977)".

Finally, Wehling claims prejudice because the government failed to uncover any new evidence between 1975–1976 and 1980, and delayed prosecuting the case in order to gain a tactical advantage over him. We disagree. Even if the investigation was unproductive "prosecutors are under no duty to file charges as soon as probable cause exists and before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt". *United States v. Lovasco*, 431 U.S. 783, 791, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977).

To bolster his claim of delay to gain a tactical advantage Wehling points to the government permitting subpoenaed witnesses to report to the United States Attorney's office rather than the grand jury and the filing of a padded witness list. We fail to understand the nexus between these claims and pre-indictment delay. And it borders on the frivolous for Wehling to argue that the prosecutors pre-indictment conversations with counsel for Columbia Broadcasting System in answer to media inquiries was proof that the government delayed in order to obtain a tactical advantage.

■ Wehling's final argument is that he should have been permitted to inspect the grand jury minutes from the 1975–1976 investigation. Most of this material was revealed to Wehling as *Jenks* material. Absent a showing of prejudice by delay, there was no necessity to disclose the remaining minutes.

AFFIRMED.