**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Glen ADKINS, a/k/a Alan Perlman, Tom Adkins, Walter Cannon, Ron H. Hawkins, Defendants-Appellants.**

**No. 83–2608.**

United States Court of Appeals,
Fifth Circuit.

Sept. 4, 1984.

Rehearing and Rehearing En Banc

Denied Nov. 5, 1984.

Stanley G. Schneider, Houston, Tex., for Glen and Tom Adkins.

Dan B. Gerson, Houston, Tex., for Hawkins.

Don Ervin, Houston, Tex., for Cannon.

Daniel K. Hedges, U.S. Atty., James R. Gough, Susan L. Yarbrough, Asst. U.S. Attys., Houston, Tex., Patty Merkamp Stemler, Mervyn Hamburg, Atty., Appellate Section, Crim.Division, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before GEE, POLITZ and RANDALL, Circuit Judges.

GEE, Circuit Judge:

Defendants were found guilty by a jury of several counts of mail fraud in violation of 18 U.S.C. § 1341 (1976). On appeal they

claim: (1) the district court erred in admitting a Dun & Bradstreet report and the banking records of Southwestern Manufacturing & Equipment Co.; (2) the conduct of the trial judge denied them a fair trial; (3) the district court erred in failing to give certain requested jury instructions; and (4) the evidence was insufficient to support their convictions. Finding no merit in these contentions, we affirm.

## I. *Facts*

Defendants were engaged in a scheme to defraud companies involved in financing the purchase of heavy machinery. These companies lease heavy machinery to companies that cannot afford to purchase it outright or through bank loans. In a typical transaction, the leasing company, upon determining that a lessee is creditworthy, purchases from a vendor machinery needed by the lessee. The vendor then sends the equipment directly to the lessee, who notifies the leasing company of the machinery's arrival and condition. At that point, the leasing company pays the vendor and begins to receive monthly lease payments from the lessee.

Defendants Glen Adkins, Tom Adkins and Walter Cannon owned vendor companies that never actually had any machinery. Cannon, and later defendant Ron Hawkins, owned Powerguard of Texas, Inc., a lessee company that would falsely certify to victim leasing companies that it had received equipment from the phony vendors. After the victims paid Cannon and the Adkins brothers for the machinery, Powerguard defaulted on the lease payments. When the leasing companies attempted to repossess the equipment, they discovered that it had never existed or was worthless.

## II. *Admissibility of Dun & Bradstreet Report*

■ Defendants contest the admission of a Dun & Bradstreet report that described the business of Southwestern Manufacturing & Equipment Co., a spurious lessee company owned by Tom and Glen Adkins. The report listed the names of Southwestern's corporate officers, the number of its employees, the amount of office space and the credit history of the company. Through other testimony, the government demonstrated that most of the information was false. Defendants argue that the report was hearsay and should not have been admitted.

Hearsay is a statement offered in evidence to prove the truth of the matter asserted. Fed.R.Evid. 801. The Dun & Bradstreet report was not offered, however, to prove the *truth* of the matter asserted, that Southwestern's facilities and employees were as reported. Rather, the government offered the report to establish a foundation for later showing, through other admissible evidence, that it was false. *United States v. McDonnel,* 550 F.2d 1010, 1012 (5th Cir.), *cert. denied,* 434 U.S. 835, 98 S.Ct. 123, 54 L.Ed.2d 96 (1977). When statements are introduced to prove the *falsity* of the matter asserted, they are not inadmissible as hearsay. *Id. Cf. Anderson v. United States,* 417 U.S. 211, 220, 94 S.Ct. 2253, 2260, 41 L.Ed.2d 20 (1974); *United States v. Hershenow,* 680 F.2d 847, 861 n. 12 (1st Cir.1982); *United States v. Weaver,* 565 F.2d 129, 136 (8th Cir.1977), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978). Thus, the Dun & Bradstreet report is not hearsay and was properly admitted.

## III. *Admission of Southwestern's Banking Records*

■ Defendants next assert that the trial court should, as a sanction against the government for violating discovery rules, have refused to admit the banking records of Southwestern. Defendants have not shown, however, that the government violated any discovery rule.

Defendants admit that, prior to trial, the prosecutor informed them that he had the bank records and that they were available for inspection. The prosecutor also told defendants that as of that time he did not intend to offer the records in evidence.

On the third day of trial, the government informed defense counsel that it had reconsidered and would introduce the records. The prosecutor then provided defense coun-

sel with copies of the records. The next day the court admitted the records, but stated that defendants' counsel could defer cross-examining Special Agent Jim Burkett, who was to testify as to the contents of the records, for four days in order to permit them to familiarize themselves with the records' contents.

Defendants argue that they were denied a fair trial because the government lied to them about the records and because the records were incomplete. The government did not lie; the prosecution truthfully told defendants it did not intend to introduce the records *at that time*. Defendants were given four days to re-examine the records once they were introduced and have not shown that they needed more time. In addition, although the records were incomplete, the discovery rules require the government only to turn over those records actually in its possession, Fed.R.Crim.P. 16(a)(1)(C), and here the government did so.

### IV. *Intervention of Trial Judge*

Defendants contend that the trial judge participated in the trial in a manner favoring the prosecution, thereby denying them a fair trial. They note that, on several occasions, the court asked questions of witnesses and cut off defense counsel's questioning. In addition, defendants point to several comments of the trial judge that they contend displayed to the jury a bias toward the government. For example, the following colloquy occurred during the testimony of Jeri Glynn, an officer of one of the victim leasing companies:

Q. But you would say that verifying the equipment in that fashion would be a good business practice?

A. Definitely.

Q. Okay. And you're sorry you didn't do it this time?

A. Yes.

Q. Okay.

The Court: You don't get bilked because you're smart.

Record XIV at 198–99. In addition, defendants point to statements made by the trial judge during the testimony of Jolana Ward, one of Cannon's ex-girlfriends:

Q. Okay. Did you ever lose custody of the children?

A. No. David—

The Court: Excuse me. What's the relevance of all this?

Mr. Brown (counsel for the government): I'm going to object to the relevancy of this, your honor.

Mr. Ervin: Your honor, there's going to be extensive testimony about her living with Sterling Russell, and so on, taking the children with her. I'd just like to clear all this up now.

Mr. Brown: What relevance does this have?

The Court: Just a minute, counsel. I'll handle this. You'll win if you just be quiet.

Mr. Brown: All right.

The Court: I don't see any relevance on custody of the children in this case. Let's not try a divorce case. Let's try this case.

Record XVI at 710–11.

Federal judges have wide discretion with respect to the tone and tempo of proceedings before them; they are "not mere moderators or hosts at a symposium." *United States v. Perez*, 651 F.2d 268, 271 (5th Cir.1981). We have fully described this role of the trial judge in *Moore v. United States*, 598 F.2d 439, 442 (5th Cir.1979) (footnotes omitted):

[t]he trial judge has a duty to conduct the trial carefully, patiently, and impartially. He must be above even the appearance of being partial to the prosecution. On the other hand, a federal judge is not a mere moderator of proceedings. He is a common law judge having that authority historically exercised by judges in the common law process. He may comment on the evidence, may question witnesses and elicit facts not yet adduced or clarify those previously presented, and may maintain the pace of the trial by interrupting or cutting off counsel as a matter of discretion. Only when the judge's conduct strays from neutrality is

the defendant thereby denied a constitutionally fair trial.

Moreover, even if the trial judge does commit error in such a respect, the complaining party must prove that the error was substantial and that it prejudiced his case. *Ruiz v. Estelle*, 679 F.2d 1115, 1129 (5th Cir.1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

■ Our review of the record reveals that the trial judge's questioning of witnesses and interruption of counsel did not demonstrate a bias toward the prosecution. The questions "sought only to clarify a witness's testimony," and the trial judge legitimately interrupted counsel's questioning when necessary to expedite the proceedings. *United States v. Borchardt*, 698 F.2d 697, 700 (5th Cir.1983). The judge's conduct here did not deny defendants a fair trial.

■ We are more troubled by the court's "bilked" comment and the statement that counsel for the government would win if he kept quiet. These statements could suggest to the jury that the court believed that the defendants "bilked" the leasing companies. Nevertheless, while the court erred in making these comments, defendants have not demonstrated that the errors were substantial and that they prejudiced their case. These statements were isolated in nature; the remainder of the lengthy trial was conducted in a fair and unbiased manner. Moreover, these two statements alone did not create a risk that the jury would fail to conscientiously "find the facts, apply the law, and reach a fair verdict," nor did it create a risk that the public would not perceive the trial "as a fair adjudication of guilt or innocence, presided over by a neutral magistrate." *Daye v. Attorney General of the State of New York*, 712 F.2d 1566, 1571–72 (2d Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). Finally, the judge specifically instructed the jury that any comments he made were not intended to favor one side over another. *See Borchardt*, 698 F.2d at 700. Thus, while we disapprove of the trial court's conduct in the respects noted, we hold that defendants were not denied a fair trial by it.

## V. Jury Instructions

### A. Good faith.

■ Defendants argue that the district court erred in failing to give an instruction on good faith, a complete defense to a mail fraud charge. *United States v. Goss*, 650 F.2d 1336, 1344–45 (5th Cir.1981). None of the defendants, however, objected to the omission of a good faith instruction at the end of the court's charge. Counsel objected to the omission of certain other instructions, and objected in general to the trial court's failure to adopt the submitted written instructions. Such a general objection does not meet the requirements of Rule 30, Fed.R.Crim.P., in that it does not distinctly state the matter to which defendants object nor the grounds of their objection. *United States v. Bey*, 667 F.2d 7, 10 (5th Cir.1982). Nevertheless, we will still consider the objection under Rule 52(b), Fed.R.Crim.P., if it constitutes plain error; that is, error "so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of [the] judicial proceedings and result in a miscarriage of justice." *United States v. Howton*, 688 F.2d 272, 278 (5th Cir.1982).

■ Defendants have not demonstrated plain error. First, Hawkins and Cannon did receive good faith instructions. While the instructions did not contain the particular wording requested by them, *see United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir.1983), the charge accurately presented the good faith issue and was not, as alleged by defendants, limited to requiring specific intent to defraud, *Goss*, 650 F.2d at 1345.

■ Second, although the Adkins brothers did not receive a good faith instruction, it is questionable whether the evidence presented at trial established an evidentiary foundation for the defense. *See United States v. Wehling*, 676 F.2d 1053, 1057 (5th Cir.1982). Under such circumstances, we cannot say that the failure of the trial court to give a good faith instruction *sua*

*sponte* for the Adkins seriously affected the "fairness, integrity or public reputation" of the proceedings. The failure to give the instruction was not plain error.

**B. Timing of the fraud.**

■■■ Hawkins also argues that the court failed to instruct the jury that he could not be found guilty if he participated only after the scheme took place and if such participation was not in furtherance of the scheme. After the charge was read, counsel for Hawkins objected to the failure to give these instructions.

The court did instruct the jury, however, that Hawkins could be convicted on a particular count only if he was "involved in the plan or scheme at the time of the mailing on a particular count." Record XX at 1458. In addition, the jury was instructed that the government had to prove that the mailings were "for the purpose of executing the scheme to defraud." Record XX at 1444. These encompass Hawkins' proposed instructions, and thus the court did not err.

**VI.** *Sufficiency of the Evidence*

■■■ In determining the sufficiency of the evidence, we must view the evidence and all reasonable inferences which may be drawn from it in the light most favorable to the government. *United States v. Shaw,* 701 F.2d 367, 392 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1974). We reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* This standard of review remains the same whether the evidence is direct or circumstantial. *Id.* at 394.

**A. Alan Perlman.**

Glen Adkins maintains that the evidence was not sufficient to show that it was he who posed as "Alan Perlman," the Southwestern representative who dealt with many of the leasing companies. Jolana Ward testified, however, that she heard Glen Adkins identify himself in a telephone conversation as "Alan Perlman." The jury

was certainly entitled to credit this testimony. *United States v. Mack,* 695 F.2d 820, 822 (5th Cir.1983). Moreover, her testimony was corroborated by the testimony of Burkett and O'Leary that Glen Adkins and his brother operated (and indeed were the only employees of) Southwestern.

**B. Glen and Tom Adkins.**

The Adkins brothers argue that the evidence was not sufficient to show that they defrauded the leasing companies. We disagree. Ward and O'Leary testified that the Adkins owned Southwestern, and clearly the jury could infer from the testimony of the leasing companies that those companies had been defrauded by Southwestern. Susan Moore, another of Cannon's exgirlfriends, testified that Cannon had told her that the Adkins were defrauding leasing companies. Ward testified that she saw Tom Adkins give large amounts of cash to Cannon on two occasions. O'Leary stated that the description of Southwestern's facilities in the Dun & Bradstreet report was inaccurate. This evidence clearly supports the jury's conviction of the Adkins for mail fraud.

**C. Hawkins.**

Hawkins challenges the sufficiency of the evidence to show his intent to defraud. The testimony of Jolana Ward demonstrates the requisite fraudulent intent. Ward testified that in the spring of 1981, before Hawkins alleged he knew about Powerguard, Cannon told her that he intended to sell the business to "the Hawk," a nickname that the jury could reasonably have inferred to mean Hawkins. She further testified that in May 1981, when she and Cannon picked up Hawkins at the airport, Cannon agreed to pay $1000 a week to Hawkins to "fade the heat" from the leasing companies. Moreover, she bought several cashier's checks for Cannon that were made out to Hawkins. Hawkins claims that we should not credit Ward's testimony. The jury, however, is the ultimate judge of the credibility of witnesses. *Mack,* 695 F.2d at 822. We will view testi-

mony as incredible as a matter of law only when it "is so unbelievable on its face that it defies physical laws." *Id.* Ward's testimony is not of such a nature.

Moreover, Ward's testimony is not the only evidence of Hawkins' guilt. Hawkins claims that he legitimately purchased Powerguard for $265,000, yet there are no financial records evidencing the transaction and he spent only a few hours inspecting Powerguard's business records and inventory. We find the evidence in the record adequate for the jury to have concluded that Hawkins' guilt was established beyond reasonable doubt.

Hawkins also argues that the mailings he sent—letters informing leasing companies that he had purchased Powerguard and was moving the company to California—were not in furtherance of the fraudulent scheme. Mailings "designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect" are mailings in furtherance of the fraudulent scheme. *United States v. Ashdown,* 509 F.2d 793, 800 (5th Cir.), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975). Hawkins' mailings fall within this "lulling" category. Nor does the failure of the letters actually to lull the leasing companies relieve Hawkins of criminal liability. *United States v. Hewes,* 729 F.2d 1302, 1321 (11th Cir.1984).

Consequently, finding no merit in defendants' contentions, we affirm the judgment of the district court.

AFFIRMED.