United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 20, 2005**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-40404

UNITED STATES OF AMERICA

Plaintiff - Appellee

VERSUS

JUAN LOZANO

Defendant - Appellant

Appeal from the United States District Court
For the Southern District of Texas, McAllen
#00-CR-439-1

Before JOLLY, DAVIS and JONES, Circuit Judges.

W. EUGENE DAVIS:[*]

In this direct criminal appeal, Lozano challenges his conviction on a number of grounds. We find no error and affirm.

I.

A number of law enforcement agencies, organized into a task force, conducted a four-year investigation of a drug organization

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

that was transporting cocaine and marijuana from the Rio Grande Valley in Texas to other parts of the United States. The investigation revealed that Juan Lozano, residing primarily in Mexico (though apparently never observed traveling to or from Mexico), organized and operated the drug organization from as early as 1995 and employed many people to transport large quantities of drugs -- and to distribute them to other drug-trafficking organizations, the participants of which were separately prosecuted.

In August 2000, Lozano, along with co-defendants Marivel Lozano (his wife), Rumaldo Lozano (his brother-in-law), and Ray Perez were indicted on various drug-related charges. Lozano was charged with 17 counts: Count One charged conspiracy to possess with intent to distribute over five kilograms of cocaine (Counts Four and Six through Eight charged the underlying substantive offenses); Count Two charged conspiracy to possess with intent to distribute over 1,000 kilograms of marijuana (Counts Five, Ten, and Fifteen through Eighteen charged the underlying substantive offenses); Count Three charged conspiracy to commit money-laundering (Counts Eleven through Fourteen charged the underlying substantive offenses).

Juan Lozano was tried with his co-defendants listed above. During trial, the Government offered the testimony of about 65 witnesses, some of whom had dealt directly with Lozano and others who had never heard of Lozano or spoken to him. On the fourth day

2

of trial, Perez changed his plea to guilty and ultimately testified against Lozano. After the Government rested its case, the district court granted a motion for judgment of acquittal as to Lozano's wife. After a full 18-day trial, during which the court denied Lozano's properly preserved motions for a judgment of acquittal, the jury acquitted Lozano's brother-in-law of the two counts in which he was charged, but convicted Lozano on all counts.

Several months later, the district court sentenced Lozano to: life imprisonment for Counts One, Two, Four, Six, Seven, and Eight (the cocaine offenses); 40 years imprisonment for Counts Five, Ten, Fifteen, Sixteen, and Seventeen (the marijuana offenses); and 20 years imprisonment for Counts Three, Eleven, Twelve, Thirteen, and Fourteen (the money-laundering offenses); a $25,000 fine, and a $1,700 assessment. Lozano timely appealed his conviction and raises a number of issues which we discuss below.

## II.

## A.

Lozano argues first that the magistrate judge erred in refusing to order the Government to disclose "reports" compiled from wire taps and witness interviews during his detention hearing.

The Jencks Act requires the Government to produce any "relevant and competent reports and statements in the possession of the Government touching the events and activities as to which a Government witness has testified at the trial." Goldberg v. United States, 425 U.S. 94, 104 (1976); 18 U.S.C. 3500(b). The magistrate

3

judge concluded that the "reports" were not "statements" the Government was required to disclose under the Jencks Act. 18 U.S.C. §3500.

The Government argues that Lozano's claim is moot now that he stands convicted. That is, the granting of bail would not have affected the outcome of the trial, and Lozano has no "current cognizable interest" in the resolution of the report disclosure issue. See, e.g., Murphy v. Hunt, 455 U.S. 478, 481 (1982). In Murphy, the Eighth Circuit, in an appeal of the detention order that was decided after the defendant had been convicted, found that the defendant had been wrongfully denied bail. The Supreme Court held, however, that the claim at issue was no longer live, and that the defendant "lack[ed] a legally cognizable interest in the outcome." Id. Murphy controls the resolution of this issue. Now that Lozano has been convicted, his claim that he was wrongfully denied Jencks Act material is no longer a live issue and does not serve as a basis for disturbing the conviction.

B.

Lozano argues next that the district court abused its discretion by disqualifying his first and second defense counsel based on conflicts of interest.

In January 2001, two days after Jose "Bobby" Flores filed a notice of appearance as Lozano's (first) counsel, the Government moved to disqualify Flores, alleging a conflict of interest because of Flores's previous representation of Lozano's co-defendant Perez.

4

The magistrate judge observed that the previous drug trafficking charges had been dismissed and were incorporated into the present case as part of the overall conspiracy. Flores claimed not to have learned anything about Lozano from Perez and Lozano and Perez signed a waiver of any conflict, which the magistrate accepted and denied the Government's motion.

Two months later, the Government filed a sealed motion to disqualify and requested reconsideration of the conflict issue, arguing that Flores was now an unindicted co-conspirator in the case. At the conflict hearing, several FBI agents testified as to wire intercepts and surveillance that revealed connections between Flores and others in the drug conspiracy. The magistrate again advised Lozano of the potential conflict, which Lozano again waived. The magistrate concluded that it would be inappropriate to allow Flores to continue representing Lozano, citing the integrity of the judicial system and based on "appearances and potential for problems in this criminal proceeding as it goes forward," and disqualified him in a written order dated June 11.

Lozano then retained Jack Pytel and Robert Berg. At a pretrial hearing on August 20, the district court questioned Flores's apparent continued involvement in the case. The marshals verified that Flores had discussed a plea offer with Lozano, and Flores apparently acknowledged that he was back on the case at the request of Lozano's family. The court also inquired about any connections between Flores and Lozano's new counsel. Berg

5

acknowledged that Flores had first contacted him about representing Lozano should Flores be disqualified, while Lozano had apparently hired Pytel directly. Berg claimed to have had no substantive discussions with Flores after being hired, but that Flores had offered to let Berg use his offices, and he did so "just to meet" with Flores. The court advised Lozano of this serious potential conflict, which Lozano again attempted to waive.

During a recess, Berg informed the Government that he had previously represented Flores on a motion to quash a grand jury subpoena. He also stated that he might call Flores as a witness in this case, but claimed that Pytel would examine Flores. Flores waived any attorney-client privilege he had with Berg. It was also revealed that Berg had been paid for this case directly by Flores, with the "understanding" that the money came from Lozano's sister. The payment was in cash, but Berg did not know how much money he had received because he "had not counted it yet" and had not filed any documents reporting the transaction. At Lozano's request, the court appointed Micaela Alvarez to discuss these conflicts with him.

The court reconvened on September 20 and decided that, in the light of the questionable connections between Flores and Berg, and of Pytel being able to represent Lozano with no apparent conflicts, Berg's potential conflicts were too great. Despite Lozano's desire to continue with Berg as counsel, the court deemed the conflict not waiveable and disqualified Berg.

This court reviews a district court's disqualification of a defense attorney for conflict of interest for abuse of discretion. United States v. Millsaps, 157 F.3d 989, 995 (5th Cir. 1998). The Sixth Amendment guarantees a defendant's right to effective assistance of counsel and a "correlative right to representation free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981).[2] An actual conflict exists when "defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." Perillo v. Johnson, 205 F.3d 775, 782 (5th Cir. 2000) (citing Srickland v. Washington, 466 U.S. 668, 692 (1984)).

Should a defendant desire to waive the conflict, the trial court must establish a knowing, voluntary waiver. United States v. Garcia, 517 F.2d 272, 274 (5th Cir. 1975). In determining the validity of a waiver, the district court is afforded "substantial latitude in refusing waivers of conflicts of interest not only if an actual conflict is demonstrated, but in cases where a potential for conflict exists which may result in an actual conflict as the trial progresses." United States v. Vasquez, 995 F.2d 40, 45 (5th

---

[2]The right to assistance of counsel does not guarantee that a defendant will be represented by a particular attorney. Caplin & Drysdale v. United States, 491 U.S. 617, 624 (1989). Although there is a presumption in favor of a defendant's counsel of choice, that presumption may be overcome by the existence of an actual conflict or by evidence of a serious potential for conflict. Wheat v. United States, 486 U.S. 153, 159 (1988).

Cir. 1993) (citing <u>Wheat</u>, 486 U.S. at 163).[3]  The court must also evaluate the potential effect on the integrity of the judicial system.  <u>United States v. Medina</u>, 161 F.3d 867, 870 (5th Cir. 1998); <u>United States v. Rico</u>, 51 F.3d 495, 511 (5th Cir. 1995).

Lozano argues that for an actual conflict claim to prevail on appeal, one's lawyer must have been operating under an actual conflict which adversely affected his lawyer's performance. The Government properly points out that the actual and/or potential conflicts of interest in this case only begin with the conflicts raised by prior representations and extend to almost every conceivable conflict of interest problem.  First, the conflicted counsel potentially has privileged information unavailable to non-conflicted counsel.  Moreover, certain evidence indicated that Flores was an indictable co-conspirator, and was advising other co-conspirators on how to avoid detection and prosecution.  Indeed, Flores was as much a potential witness as a potential co-defendant. And Berg's connections to and dealings with Flores suggest that Berg's representation was simply a "pseudo-representation" by Flores.  The fact that Flores remained involved in the case after his disqualification further tainted Berg's representation.

In sum, the district court properly observed the potential

---

[3]An accused's right to waive conflict-free representation is not absolute.  <u>See</u>, <u>e.g.</u>, <u>United States v. Sotelo</u>, 97 F.3d 782, 791 (5th Cir. 1996) (district court did not abuse its discretion by refusing waiver to permit multiple representation of defendants).

pitfalls during the upcoming trial and the threats to the integrity of the judicial process inherent in Flores's and Berg's continued representation of Lozano in the case. The court did not abuse its discretion in disqualifying them.

C.

Lozano argues next that the indictment does not sufficiently allege a money laundering conspiracy offense in violation of 18 U.S.C. §1956(h).

We review *de novo* the issue of whether an indictment sufficiently alleges all elements of an offense. United States v. Biegnaowski, 313 F.3d 264, 285 (5th Cir. 2002). The substantive offense of money laundering is set forth in §1956(a). A separate subsection states that "any person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h). One of the elements of the substantive offense of money laundering is that the defendant knew that the property used in a financial transaction represented unlawful activity. Lozano contends that the indictment failed to allege this essential element of the conspiracy offense with which he was charged.

Lozano's argument fails for a number of reasons. First, count 3 of the indictment charged the defendants with "knowing that the transaction was designed in whole or in part to conceal and

9

disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, and that while conducting and attempting to conduct such a financial transaction, that the property involved in the financial transactions . . . represented the proceeds of some form of unlawful activity in violation of 18 U.S.C. § 1956(a)(1)." Lozano seems to argue that Count 3 fails to allege Lozano's knowledge that the property used in the financial transaction represented unlawful activity because he is not listed in the "overt acts" as having such knowledge. The above quoted portion of the allegations of Count 3 of the indictment adequately alleges Lozano's knowledge that the property involved in the financial transactions represented the proceeds of unlawful activity.

Moreover, because Lozano is charged with conspiracy to commit money laundering under § 1956(h), the knowledge element Lozano claims is missing from the indictment is not even an element of the crime. See Threadgill, 172 F.3d at 366-67. In Threadgill, we held that charging the defendant with conspiracy to commit money laundering was sufficient to apprise a defendant of the charged crime without requiring the inclusion of the elements of the substantive crime. For these reason, we conclude that Count 3 of the indictment adequately charged Lozano with money laundering conspiracy under § 1956(h).

D.

Lozano argues next that the district court erred by allowing

10

the Spanish speaking jury to hear and consider tapes of Lozano's conversations in Spanish. The district court admitted into evidence tapes of several conversations in which Lozano participated that were conducted in Spanish. All the jurors stated that they spoke and understood Spanish. The court informed all parties that English transcripts of the tapes would also be admitted, but only as aids--the tapes controlled in the event of a discrepancy. The court also invited the defendants to submit their own competing English transcripts. The court then admitted both the Spanish tapes and the English transcripts. The Spanish tapes were played in open court and the jurors had the English transcripts available to read as they were listening to the tapes.

Lozano argues that the district court abused its discretion when it admitted into evidence recordings that were in a language other than English. He contends that such evidence allowed the jurors to impose their own translation of colloquial expressions, particularly with respect to "Valley Spanish." Lozano suggests that the English transcript should have been the primary source of evidence and not the Spanish tapes.

We review a district court's evidentiary rulings for abuse of discretion. United States v. Gutierrez-Farias, 294 F.3d 657, 661 (5th Cir. 2002). However, as in this case where the defendant failed to object at trial, we review for plain error. United States v. Krout, 66 F.3d 1420, 1434 (5th Cir. 1995), citing United States v. Olano, 507 U.S. 725 (1993). To prevail under this

11

standard, the appellant must show an error that was plain, that affected his substantial rights and that seriously affects the fairness, integrity or public reputation of judicial proceedings.

The Jones Act, 48 U.S.C. § 864, requires that court proceedings in United States federal courts be conducted in English. <u>Morales-Madera</u>, 352 F.3d at 4. However, tapes of recorded conversations are not "testimony" but are admitted in evidence as exhibits. This is true whether the taped conversations are in English or some other language. <u>Id</u>. At 7. The law is also clear that the tape recording itself constitutes the best evidence and that a transcript of that tape is used as an aid to understand the tape. <u>United States v. Craig</u>, 573 F.2d 455, 480 (7th Cir. 1977).

Lozano relies upon <u>United States v. Valencia</u>, 957 F.2d 1189 (5th Cir. 1992), where this court affirmed the exclusion of taped conversations which took place in Spanish. That case is readily distinguishable. In <u>Valencia</u>, only two of the jurors spoke Spanish and both parties stipulated to the accuracy of the English transcripts of the tapes. In the instant case, however, all of the jurors spoke Spanish and the parties did not stipulate to the accuracy of the English translation. Furthermore, because the English translation was admitted into evidence, the jurors had available to them the English translation of each tape as it was played and had available both the tape and the English translation

12

in the jury room.   In the light of these facts, we are satisfied that the district court committed no plain error in allowing the jurors to hear the Spanish tapes.

E.

Lozano argues next that the evidence was insufficient to support his convictions for conspiracy to commit money laundering and the substantive offense.   This court reviews challenges to the sufficiency of the evidence "in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Brown, 217 F.3d 247, 254 (5th Cir. 2000). "The evidence need not exclude every reasonable hypothesis of innocence, and the jury is free to choose among reasonable constructions of the evidence."  United States v. Cano-Guel, 167 F.3d 900, 904 (5th Cir. 1999).  If the evidence supports equally or gives nearly equal circumstantial support to theories of guilt and innocence, this Court will reverse because, under these circumstances, the jury must necessarily entertain a reasonable doubt.   See, e.g., United States v. Sanchez, 961 F.2d 1169, 1173 (5th Cir. 1992).

The elements of a conspiracy to commit money laundering are: (1) that there was an agreement between two or more persons to commit money laundering, and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the

13

illegal purpose. <u>United States v. Meshack</u>, 225 F.3d 556, 573 (5th Cir. 2000).

To establish the substantive offense of money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), the Government must show the defendant "(1) knowingly conducted a financial transaction; (2) which involved the proceeds of an unlawful activity; and (3) with the intent to promote or further unlawful activity." <u>United States v. Dovalina</u>, 262 F.3d 472, 475 (5th Cir. 2002).

For purposes of § 1956, a financial transaction can be established by evidence that cash proceeds from drug trafficking are given to the care and possession of another. <u>United States v. Garcia Abrego</u>, 141 F.3d 142, 160-161 (5th Cir. 1998). To satisfy the promotion element of a money laundering conviction, the Government must show that a defendant conducted the financial transaction in question with the specific intent of promoting the specified unlawful, activity. <u>United States v. Valuck</u>, 286 F.3d 221, 226 (5th Cir. 2002). Payment to co-conspirators for their participation in the conspiracy for the purpose of continuing the unlawful activity amounts to "promoting the carrying on of the unlawful activity." <u>United States v. Wilson</u>, 249 F.3d 366, 378 (5th Cir. 2001).

The Government produced substantial evidence to support Lozano's conviction for conspiracy to launder money. Multiple witnesses place Lozano in charge of the drug organization: Casas transported drugs, called Lozano if there was trouble with a

14

shipment, and verified that attorney Flores was on standby to provide legal advice. Multiple phone intercepts established that proven drug traffickers had close ties to Lozano and that they purchased a trailer used to transport drugs with a large cash payment. The Government produced evidence that members of the Lozano organization transported drugs and then would receive large cash payments for transport back to Lozano back in Texas. This evidence established the existence of an agreement to conduct financial transactions that promoted the drug trafficking enterprise as well as Lozano's knowledge and voluntary participation in that enterprise. The jury was entitled to reject Lozano's evidence that his large cash purchases for property vehicles, horses, furniture and other items were made from legitimate income.

With respect to the substantive offenses of money laundering, various witnesses testified as to the drug related financial transactions pertaining to each count. Testimony and wire intercepts established that Lozano asked certain underlings to bring him drug proceeds on February 28, 2000. (Count 11) Testimony and wire intercepts established drug related financial transactions by Lozano's co-conspirators on March 8 (Count 12), March 13 (Count 13) and March 22, 2002 (Count 14). See United States v. Garcia, 917 F.2d 1370, 1377 (5th Cir. 1990)(party to a conspiracy may be held responsible for a substantive offense committed by a co-conspirator even if that party has no knowledge of that particular

15

substantive offense).

Our review of the record persuades us that the Government produced substantial evidence that would permit a rational trier of fact to find Lozano guilty of both the conspiracy and substantive money laundering counts.

F.

In Lozano's final assignment of error, he argues that the district court abused its discretion by interfering with his cross-examination of certain witnesses, thereby depriving him of a fair trial. Lozano's brief points to dozens of instances in the record where the district court interrupted his trial counsel during cross-examination of the Government's witnesses.[4] Lozano argues that the district court's actions created the appearance that the district court sided with the Government and lead the jury to presume guilt. Lozano further argues that the district court's multiple statements to the jury explaining its impartiality were insufficient to cure the constitutional error.

This court reviews a district court's examination of witnesses and involvement in a trial for abuse of discretion. United States v. Martinez, 151 F.3d 384, 390 (5th Cir. 1998). The district court has wide discretion over the "tone and tempo" of a trial and may elicit information from a witnesses if he believes it would benefit

_____

[4] Lozano complains of the court's questioning of Jorge Casas, Angel "Chago" Vela, Sergio Guerra, Ruben Vasquez, Jr., Mario Martinez Alejos, and FBI Agents Ernesto Cruz and Jorge Velasco.

16

the jury.  <u>United States v. Saenz</u>, 134 F.3d 697 (5th Cir. 1998).

In reviewing a claim of partiality by a district judge, we must

"determine whether the judge's behavior was so prejudicial that it

denied the [defendant] a fair, as opposed to a perfect, trial."

<u>United States v. Williams</u>, 809 F.2d 1072, 1086 (5th Cir. 1987).  To

make this determination, we must consider the district court's

actions as a whole, considering factors such as context, frequency,

and the presence of curative instructions.  <u>United States v. Lance</u>,

853 F.2d 1177, 1182 (5th Cir. 1988).

Lozano, in his brief to this court, details literally dozens

of instances where the district court questioned witnesses and made

comments during Lozano's cross-examination of Government witnesses.

Considered out of context, these numbers appear troubling; however,

when we consider the fact that this trial lasted 18 days and the

Government presented 65 witnesses, the number of interruptions by

the district court is not unreasonable on its face.  The need for

a trial court to question witnesses and clarify testimony is

proportionate to the length of a trial and number of witnesses

presented.  <u>Id</u>. at 703; <u>Williams</u>, 809 F.2d at 1087.

Turning to the content of the district court's actions, a

thorough review of the record reveals that several of the district

court's actions have been mischaracterized by Lozano in this

appeal.[5]  The record also reveals that many of the interruptions

_____

[5] For example, Lozano argues that the district court
interrupted his trial counsel and called him to the bench just as

17

were aimed at remedying the often repetitive questioning by

Lozano's attorney's.[6]   Interruptions of this type become more

---

"he was about to gain a concession" from the witness regarding the fact that he had not mentioned [the defendant] to the agent with whom he was cooperating before he was arrested." Appellant's Brief, p. 25.  The record clearly reveals that it was Lozano's counsel, not the district court, who requested permission to approach the bench in order to inform the district court that he intended to use documents not in evidence.  And, naturally, when the Government expressed concern over the genuineness of the documents the district court reminded the Government that they would have a chance to voir dire before the documents were used.  See R. Vol. 28, p. 82-84.

[6] For example, Lozano lists the following interruption as problematic.  Here, Lozano's counsel questions Jorge Casas on cross and attempts to establish that he is not trustworthy:

Q: Now, Mr. Casas, you have told a lot of lies in your lifetime, haven't you?
A: Yes.
Q: You have lied to the DEA agents, right?
A: Yes.
Q: As a matter of fact, when you became an informant, you signed a contract with the Drug Enforcement Administration, correct?
A: Yes.
Q: And as part of that contract, was that you not lie, correct?
A: Yes.
Q: Yet, you lied to them, correct?
A: Yes.
Q: Further, that you were not to be engaged in any drug trafficking while you were an informant, yet, you went and ventured on your own drug business while you were an informant, correct?
A: Yes.
Q: You also lied to other drug dealers, your co-workers or employees or cohorts, correct?
A: Yes.
Q: You have asked other people to lie, such as, your wife and your mother-in-law, correct?
A: My ex-mother-in-law and my ex-wife.
Q: And you have asked them to lie when the only one that would benefit form the lie would be you, correct?

18

justified as the length of a trial increases.  <u>Saenz</u>, 134 F.3d at 704-05; <u>United States v. Adkins</u>, 741 F.2d 744, 748 (5th Cir. 1984).  The record further reveals that many of the Government's witnesses spoke very little English and needed the assistance of an interpreter.  These language difficulties sometimes required the district court to ask questions to clarify the witnesses earlier

---

**A**: Yes.
**Q**: When I say "lie," Mr. Casas, you instructed them, actually, to commit perjury, to commit--to say--to tell a lie under oath, correct?
**A**: I don't understand. How is that?
**Q**: Pardon me. I'm sorry.  If they were asked to come in an testify under oath, you instructed them to lie for you, correct?
**A**: Yes.
**Q**: And your involvement, with respect to drug dealing, you have also threatened people, correct?
**A**: Yes.
**Q**: And it appears as though, Mr. Casas, that every time you have a problem, that is, you're caught in a crime, you decide to join forces with law enforcement against other people, correct?
**A**: Yes.
**Q**: Okay. Now, you have admitted that you have lied to DEA agents under oath, other drug dealers, asked people to lie for you and that's the truth, is it not?
**A**: Yes.
**Q**: You've also had, for example, in your possession a driver's license that had your photo, yet somebody else's name; is that correct?
**A**: Yes.
**Q**: And you've admitted to telling big lies, huge lies, correct?
**THE COURT**: How many times are we going to ask the same question, Mr. Pytel?  I think he as made an admission here. I don't think we need to be repetitive here.

testimony.[7]  In addition, the district court was sometimes required to interject and correct the interpreter.[8]   Where a witness's testimony is confusing or misinterpreted, a court is certainly justified in interjecting for the sake of clarity and correctness. Saenz, 134 F.3d at 704; United States v. Adkins, 741 F.2d 744, 748 (5th Cir. 1984).   The record also reveals that on some occasions

---

[7] For example, on direct examination Sergio Guerra testified that he had spoken directly with Lozano about hiding a shipment of marijuana. R. Vol. 31 at 107-108.  On cross examination, however, Sergio Guerra and Lozano's counsel had the following exchange:

**Q**: Has [Lozano] been involved in the drug business?  Ever been involved in the drug business?
**A**: Not that I know of, but people have tell me.
                    *    *    *
**THE COURT**: And your testimony, you're also saying that you also had a conversation yourself with Mr. Lozano, or are your taking that testimony back?
**THE WITNESS**: Excuse me, Your Honor.
**THE COURT**: You said you had a conversation with Mr. Lozano about some marijuana.
**THE WITNESS**: Yes.
**THE COURT**: Or is that not true?
**THE WITNESS**: That is true.
**THE COURT**: Ok, go ahead.

R. Vol. 31 at 124-125.

[8] During the cross-examination of Angel Vela:

**Q**: And it was seven months later, in March of this year that you first met with the FBI agents about your involvement?
**THE COURT** (to the interpreter): I don't think it was "the attorneys" (sic) he said.  I think he meant "the FBI and law enforcement officials" is what he said.
Repeat the question because this wasn't interpreted correctly.

R. Vol. 31 at 26.

20

the district court interjected because Lozano's counsel clearly mischaracterized a witness's testimony.[9] Finally, the record shows that throughout the trial the district court repeatedly instructed the jury that nothing he said or did was to be considered as an endorsement of either party.

We have reviewed all of the passages in the record relied upon by Lozano in support of his claims that the district court unduly interjected itself into the trial to Lozano's prejudice. We conclude that the district court had solid grounds for its comments and questions as discussed above, and thus the district court's comments and questions did not amount to an abuse of discretion.

---

[9] For example, on cross-examination of Jorge Casas:

**Q**: Now, what has happened to all this money that you have made, Mr. Casas, throughout the years?
**A**: I've made investments.
**Q**: Such as?
**A**: The hotel. The shops I have in Mexico.
**Q**: What else?
**A**: I've bought real estate.
**Q**: In the United States or in Mexico?
**A**: In Mexico and here.
**Q**: Where do you have property here?
**A**: Right now, I don't have any.
**Q**: So that's a lie?
                    \*   \*   \*
**MS. PROFIT** (Government): Your Honor, I'm going to object. That–
                    \*   \*   \*
**THE COURT**: I mean, it's a mischaracterization to say "that's a lie." He didn't say that he owned it right now. He said he has invested in property and so that is a mischaracterization and that's a proper [objection].

R. Vol. 28 at 47-48

21

III.

For the reasons stated above, we conclude that Lozano's assignments of error are without merit. The judgment of the district court is

AFFIRMED