809 F.2d 1072
 22 Fed. R. Evid. Serv. 485
 UNITED STATES of America, Plaintiff-Appellee,
v.
Drake WILLIAMS, Vance E. Williams, Oscar Silva, Edward
Orellana, Michael Sahs, Joseph C. Watson, Jan E.
Grossman, Salvador Meraz, and Tanny
Miller, Defendants-Appellants.
 No. 85-2588.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 29, 1987.
 
 David H. Berg, Joel Androphy, Houston, Tex., for Drake Williams.
 Clyde W. Woody, Houston, Tex., for Vance Williams.
 Dick DeGuerin, Houston, Tex., for Oscar Silva.
 Robert S. Bennett, Houston, Tex. (Court-appointed), for Edward Orellana.
 Michael E. Tigar, Austin, Tex., (Court-appointed), for Michael Sahs.
 Jim Skelton, Houston, Tex., for Joseph C. Watson.
 George McCall Secrest, Jr., Houston, Tex., for Jan E. Grossman.
 Charles Louis Roberts, Joseph Abraham, Jr., El Paso, Tex., for Salvador Meraz.
 Ray Bass, Austin, Tex. (Court-appointed), for Tanny Miller.
 Mervyn Hamburg, Atty., Dept. of Justice, Washington, D.C., Henry K. Oncken, U.S. Atty., James R. Gough, Kenneth Magidson, Asst. U.S. Attys., Houston, Tex., for U.S.
 Appeals from the United States District Court for the Southern District of Texas.
 Before GEE and HILL, Circuit Judges, and HUNTER,* District Judge.
 GEE, Circuit Judge:
 
 
 1
 Nine appellants directly appeal their convictions from the district court. We affirm except as to Oscar Silva, all of whose convictions we reverse for further proceedings, as to Vance Williams, whose conviction on count 3 we reverse, as to Tanny Miller, whose convictions on counts 8 and 19 we reverse, and as to Drake Williams, as to whom we reverse on counts 5 and 6.
 
 Facts
 
 2
 This criminal trial followed a 24-count indictment that originally named the nine appellants and five others. The trial commenced with ten defendants and 19 counts. The main thrust of the prosecution centered on three RICO counts: count 1--violation of 18 U.S.C.A. Sec. 1962(d) (RICO conspiracy); count 2--violation of 18 U.S.C.A. Sec. 1962(c) (substantive RICO); count 3--violation of 18 U.S.C.A. Sec. 1962(a) (illegal investment of proceeds). Count 1 accused all appellants except Miller. Count 2 omitted Miller, Vance Williams, and Watson. Drake and Vance Williams,[1] Silva, and Orellana were charged in count 3. Next, the indictment charged Drake Williams with conspiring to evade currency transaction reporting requirements in violation of 18 U.S.C. Sec. 1001 (counts 5-6) and 18 U.S.C. Sec. 371 (count 7). The indictment included conspiracy to file false income tax returns in violation of 18 U.S.C. Sec. 371 (count 8--Drake Williams, Watson, Miller, and Silva), as well as the completed substantive offenses in violation of 26 U.S.C. Sec. 7206(1) (counts 10, 18, and 21--Drake Williams; count 12--Watson; count 14--Silva; count 19--Miller) and Sec. 7206(2) (count 24--Watson). The other counts involved controlled substances violations: count 9--21 U.S.C. Sec. 846 (conspiracy to possess cocaine with intent to distribute) (Drake Williams, Silva, Watson, Grossman, and Miller); counts 16, 17, and 20--21 U.S.C. Sec. 841(a)(1) (substantive cocaine possession) (Drake Williams and Grossman); count 4--21 U.S.C. Sec. 848 (continuing criminal enterprise) (Drake Williams).
 
 
 3
 The trial proceeded with the nine appellants and Beverly Lunday. At the close of evidence, the district court dismissed count 9 as to Miller and count 3 as to Orellana for lack of evidence. The jury acquitted Lunday on each of the four counts that named her and acquitted Watson on count 9, convicting the rest on all other counts and finding that certain assets of Drake and Vance Williams, Silva and Sahs should be forfeited under the RICO and continuing criminal enterprise counts. The appellants received terms of imprisonment ranging from 5 years to 25 years and fines of up to $100,000.
 
 
 4
 The prosecutor filed this indictment on October 26, 1984. This followed an indictment filed in the same district, but dismissed five months earlier. The indictment resulted from a joint investigation between the Southern and Western Districts of Texas begun in the late 1970s to discover the connections between Sahs, Meraz, and Silva (El Paso residents) and Drake Williams, Vance Williams, and other individuals (Houston residents). The connections were many and for illicit purposes. Later, the two districts split their investigation and pursued different targets. The Western District Grand Jury indicted Sahs, Meraz, Silva, and others and they pled guilty in exchange for reduced charges. The Southern District prosecutor filed the present, more comprehensive, charges.
 
 
 5
 The government's case was founded on the testimony of Tim Cassias and Jude Peterson, both members of the drug conspiracies. Cassias was also a paid Drug Enforcement Administration informer. Peterson was a member who testified in return for immunity. The government produced other witnesses, including Laura Sahs, the wife of appellant Michael Sahs, to corroborate many of the details of Cassias's testimony. That testimony revealed a group of individuals that distributed marijuana from New Mexico to New England as well as distributing cocaine in Texas. For this appeal, we need only adumbrate the illicit activities of this organization.
 
 
 6
 In El Paso in the late 1970s, Vance Williams and Silva had a small business of trafficking in marijuana. They recruited Sahs to deliver drugs for them. Sahs delivered marijuana frequently to Orellana in Boston and Watson in Houston. These deliveries included as much as a ton of marijuana. Sahs prospered as a deliveryman, sufficiently so that soon he acquired a clientele of his own and retained Silva and Vance Williams as sources for his supplies.
 
 
 7
 Appellant Meraz supplied some of the marijuana and cocaine to this El Paso operation. Grossman lived next door to Sahs and would at times test the cocaine's purity for the gang. Watson would sell drugs to individuals referred to him by Drake Williams. Drake, along with Silva and Vance Williams, was also involved in obtaining the large initial supplies.
 
 
 8
 Cassias was one of the first customers of the group. He testified as to specific dealings of the group: the storage of tons of marijuana at a Girl Scout camp in New Mexico; the conversion of a mobile home into a one-ton marijuana transport machine; the delivery of marijuana for suitcases and paper bags full of cash; the purchase of property with the cash from drug activities; the organization behind the deliveries; and many more specific illegal activities. His testimony chronicles a continuing criminal conspiracy remarkable for its extensive distribution network and large cash flow.
 
 
 9
 Jude Peterson worked as an accountant for Drake Williams in Houston. Peterson's testimony ties in Drake Williams, Jan Grossman and Joseph Watson to the conspiracy: Grossman's delivery of cocaine; the receipt of Thai sticks by Drake; the supervisional role of Drake Williams in the conspiracy; the delivery of large amounts of cash; and other drug dealing activities.
 
 
 10
 Vance Williams was the first to run afoul of the law. While in New England delivering marijuana in 1977, he was snared in a wiretap that the New Hampshire police conducted on a large-scale distributor in the area. He pled guilty to the charge of marijuana trafficking and served approximately one year in prison and a half-way house from mid-1979 to mid-1980. His friends, however, did not forget him: they set aside $5 for each pound of marijuana they sold for Vance.
 
 
 11
 The drug activities generated large amounts of cash. Much of the money went directly into the cash purchase of real estate. Some money was laundered through Vance Williams and Silva's El Paso restaurant. Drake Williams, a certified public accountant, provided other ways to clean the money. Drake's story flows from rags (defaulting on his government student loans in 1972) to riches (owning a printing company and a Swiss bank account in excess of $700,000 in 1982). Unfortunately, it is not a Horatio Alger story. He did work hard, but also illegally. Drake laundered some money through bogus labor charges by some of his more successful clients who would provide a check and receive cash less a transaction fee. By such means, the customer would reduce his taxable income and Drake's friends would launder their money. This is the count that caught Tanny Miller on aiding tax fraud.
 
 
 12
 Drake's most successful laundering scheme involved one of his initial clients--A Jiffy, Inc., a Houston printing company. In 1978, A Jiffy faced bankruptcy. Drake personally loaned the owners cash (in brown paper bags) and later bought a controlling interest in the company. The company began making money hand over fist, mainly through the injection of drug money. Drake's personal finances began to mix with the company's finances and company checks were used to purchase personal items. The company also hired Vance Williams and Michael Sahs. Drake also laundered money by having people purchase cashiers' checks in amounts under the $10,000 reporting requirement. He successfully laundered close to $300,000 in this way.
 
 
 13
 The appellants argue many things on appeal. We address them below.
 
 Discussion
 I. The Plea Agreements
 
 14
 In 1982, Appellants Silva, Meraz, and Sahs were indicted in the Western District of Texas on various charges related to the charges eventually brought in the Southern District of Texas. In connection with those indictments, these three appellants entered into plea agreements with United States Attorney Bock of the Western District and pled guilty to at least one count in exchange for dismissal of other charges pending in the Western District. All three knew of the continuing investigation by United States Attorney Longoria in the Southern District and each now asserts that his agreement included an understanding that he would not be indicted in the Southern District. The trial judge conducted a hearing in which he found that the appellants' claims were untrue.
 
 
 15
 The existence of a plea agreement is a factual issue; therefore, the clearly erroneous standard of review applies to that finding. United States v. Cain, 587 F.2d 678, 680 (5th Cir.), cert. denied, 440 U.S. 975, 99 S.Ct. 1543, 59 L.Ed.2d 793 (1979). In no instance does the written plea agreement support the appellant's allegation: in each of them, the government agrees to dismiss the remaining counts in the indictment in exchange for the guilty plea.[2] The written agreements, however, do not entirely dispose of the question. If the appellants' guilty pleas rest in any significant degree on a promise or agreement of the government, that promise must be fulfilled. Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). Careful review of the evidence presented at the hearing, however, reveals substantial evidence supporting the trial court's finding that no promises other than those found in the written plea agreements existed.
 
 
 16
 The testimony at the hearing showed that the El Paso defendants' counsel "believed" that their clients would not be indicted. They "understood" that Mr. Bock "was under the impression that the Southern District investigation had carved out the [El Paso] Defendants...." Record, vol. 16 at 109 (Burrell Johnston, Attorney for Silva). This belief lasted throughout the plea negotiations from January to May. These counsel testified that Bock represented to them that their clients would not be indicted in the Southern District. They, in turn, informed their clients of this and their clients then pled guilty. Mr. Bock controverted this testimony. He agreed that they discussed the Southern District investigations, but he claims "it was in a speculative thing, because [he] didn't know what was going on in Houston." Id. at 126. Although Mr. Bock's testimony was at some points equivocal,[3] in response to the court's direct questions he stated that he did not promise that Silva would not be prosecuted in the Southern District in exchange for his present plea of guilty:
 
 
 17
 THE COURT: The bottom line is you never made any representation to the Defendant, nor his counsel, neither written or oral, that this plea arrangement in the Western District would foreclose any further indictments or prosecution?
 
 
 18
 A. No, sir, I did not. We discussed that as a possibility whether he'd be indicted in Houston or not and we discussed it in that vein, would he be indicted. I did not in any way, I don't think I ever did, say he would not be indicted. We discussed the fact he could be investigated in Houston and in my opinion, and I think it was a valid one, because I had no knowledge to the contrary, I didn't think he'd be indicted.
 
 
 19
 Id. at 131.
 
 
 20
 Mr. Bock's testimony supports the trial court's finding of no promise not to prosecute in the Southern District. Furthermore, other facts bolster this finding. The original Southern District indictment, naming Oscar Silva as a defendant, was returned on May 26, 1983. Silva did not plead in the Western District until June 3, 1983, after he was admittedly aware of the indictment pending in Houston. In that Rule 11 hearing in El Paso before Judge Hudspeth, Silva told the judge that no other promise had been made to induce his plea besides the one in the written agreement. Record, vol. 10 at 2379. In addition, at the sentencing hearing on July 21, 1983, with the Southern District indictment still pending, Judge Hudspeth asked about the indictment in Houston. Mr. Burton, Silva's counsel, stated that he was trying to resolve the matter. In response to the Judge's question whether he thought Silva was going to trial down there, Mr. Burton replied that there was "some negotiation." Id. at 2392. These facts support Judge DeAnda's finding that there was no promise in addition to those contained in Silva's written plea agreement. At the time Silva pled guilty, he knew that something was wrong with his version of the plea agreement. The time to assert the alleged oral plea agreement was before Judge Hudspeth. Silva failed to do so. The Supreme Court recently characterized a plea bargain as a "mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest." Mabry v. Johnson, 467 U.S. 504, 507, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437 (1984) (footnote omitted). Silva had the opportunity to assert his version of the agreement before he pled guilty and before he was sentenced in the Western District. His failure to do so provides additional support to the trial court's determination that no such promise existed.
 
 
 21
 Although Meraz was not named in the original Houston indictment in May 1983, and therefore pled guilty and was sentenced before learning of another indictment, strong evidence supports the trial court's finding that there was no promise other than the written plea bargain. As to Meraz, Mr. Bock testified that his personal opinion at the time of negotiations was that Meraz would be indicted in the Southern District because he was more involved with the Houston dealings. Record, vol. 16 at 137-38. In addition, the testimony of Meraz's lawyer, Mr. Caballero, indicates a more tenuous kind of "understanding"--an understanding that Meraz's problems were over, but with many fewer substantive "representations" from the United States Attorney. See 1st Supp. Record, vol. 1 at 25-28. Furthermore, at Meraz's Rule 11 hearing, he in no way indicated any other promise than that contained in the written plea agreement. Meraz Exhibit D, at 32. Taken together, these facts sufficiently support the trial court's finding that Meraz's plea bargain did not go so far as to prevent the present indictment.[4]
 
 
 22
 Appellant Sahs attempts to ride the coattails of the evidence presented by Silva and Meraz. Although his allegations raise substantial questions, he presented no testimony of any oral agreement between himself and Mr. Bock. Sahs's lawyer did not examine Bock on the witness stand, nor did either he or Sahs take the stand. The only evidence in the record is the written plea agreement and Sahs's denial at his Rule 11 hearing that there were any promises other than those in the written plea bargain. We must, therefore, uphold the trial court's findings as to Sahs.
 
 II. Immunity
 A. Jan Grossman's Claim
 
 23
 Grossman asserts that the government granted him informal use immunity in connection with his statements during the Western District's investigation of this drug conspiracy. United States Attorney Bock received authorization from the Justice Department in Washington to grant Grossman statutory use immunity,[5] but a court order never issued. Grossman cooperated with Bock's investigation by talking with the DEA on nine different occasions. Southern District United States Attorney Longoria's investigation, however, indicated that Grossman did not cooperate fully. Grossman then submitted to two lie detector tests: the first was inconclusive; the second revealed no deception on the relevant questions. Bock and Longoria, however, remained convinced that Grossman was holding back. Longoria took his evidence to the grand jury, which indicted Grossman.
 
 
 24
 Grossman then moved to dismiss the Houston indictment on the ground of impermissible use of immunized statements. After a hearing[6] and an in camera inspection of portions of the grand jury transcripts, the trial judge ruled:
 
 
 25
 Defendant Grossman contends that the Government breached an agreement that he would not be prosecuted for any offense in which he provided information to the Government. The facts alleged by Grossman, when closely scrutinized, do not support this allegation. Assuming arguendo that Grossman was granted some informal use immunity, the Government's indictment is proper under Kastigar v. United States, 406 U.S. 441 [92 S.Ct. 1653, 32 L.Ed.2d 212] (1972). The evidence presented to the Grand Jury concerning this Defendant was derived from a legitimate source, independent of the statements made by Grossman to federal agents.
 
 
 26
 Record, vol. 9 at 2056. We disagree with the trial court's finding that the facts do not support Grossman's allegations. We hold that the government's actions were sufficient to grant use immunity to Grossman.
 
 
 27
 The record belies the government's argument on appeal that Grossman was protected by an agreement only contractual in nature. The United States Attorney for the Western District moved that Grossman be ordered to testify pursuant to the immunity statutes, and the Department of Justice approved such a grant of statutory use immunity. Record, vol. 13 at 3154. When Grossman consented to the polygraph examination he emphasized the immunity agreement.[7] Most important, the government recognized the existence of the immunity agreement in its answers to Grossman's motions in the first Houston indictment, characterizing the agreement as "an informal grant of use immunity pending a formal grant of statutory use immunity." 2nd Supp. Record at 8-9. The government even admitted that the government's informal grant of use immunity had the same effect as the grant of statutory use immunity."[8] Id. at 9. We have yet to rule on this particular fact situation. In a case with similar immunity facts, in which the defendant refused to testify because he believed that the immunity authorization without the court order was insufficient, however, we held that the refusal was a valid exercise of the defendant's fifth amendment rights. United States v. D'Apice, 664 F.2d 75 (5th Cir.1981). We reserved the question, however, whether informal use immunity could be enforced:
 
 
 28
 Our decision does not foreclose the possibility that, in a different case, a prosecutor's non-statutory immunity commitment may be held enforceable, ... nor does it preclude a finding that an informal grant of use immunity by a prosecutor in one district is binding in another district or even on the entire government.
 
 
 29
 Id. at 78 n. 6 (citations omitted). Other circuits have recognized the type of informal immunity at issue here. See United States v. Society of Independent Gasoline Marketers, 624 F.2d 461, 469-74 (4th Cir.1979), cert. denied sub nom Amerada Hess Corporation v. United States, 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981); United States v. Librach, 536 F.2d 1228, 1230 (8th Cir.), cert. denied, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976); United States v. Kurzer, 534 F.2d 511, 513 n. 3 (2nd Cir.1976).
 
 
 30
 The only statutory requirement lacking in this instance was a court order; otherwise both parties agreed that Grossman cooperated pursuant to a use immunity agreement. On these facts we hold that the informal use immunity bestowed upon Grossman shields him to the same extent as would a court order had it issued. See United States v. Weiss, 599 F.2d 730, 735 n. 9 (5th Cir.1979).
 
 
 31
 The government asserts that Grossman breached the immunity agreement and therefore that it can prosecute him for such a breach. We need not rule on whether Grossman failed to cooperate fully because the government's ordinary remedy in that situation is a prosecution for false statement, not an abrogation of the immunity agreement and use of Grossman's statements to prosecute him for other offenses. See Kurzer, 534 F.2d at 518. Because Grossman cooperated with the DEA under the grant of use immunity, and was later indicted on charges related to the investigation, the government must then prove that the evidence it used before the Grand Jury was "derived from a legitimate source wholly independent of the compelled testimony." Kastigar v. United States, 406 U.S. 441, 460, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212, 226 (1972). Although Kastigar described the burden as "heavy", id. at 461, 92 S.Ct. at 1665, 32 L.Ed.2d at 227, in fact the government has only to demonstrate by a preponderance of the evidence an independent source for all evidence introduced. United States v. Seiffert, 501 F.2d 974, 982 (5th Cir.1974). We have reviewed the grant jury record submitted for Judge DeAnda's in camera inspection. We find that the evidence presented, such as it was, came wholly from other sources. See United States v. Sockwell, 699 F.2d 213, 217-18 (5th Cir.), cert. denied, 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 311 (1983). The government, in this case, met its Kastigar burden.B. Drake Williams' Claim
 
 
 32
 Appellant Drake Williams contends that Jan Grossman's earlier statements to the DEA should have been admitted as exculpatory evidence. As regards Grossman's statements, he makes three arguments. First, he asserts that the government had a duty to present Grossman's statements to the grand jury. We have just held that presentation of those statements to the grand jury would have violated Grossman's immunity agreement. In addition, we long ago determined that a complaint that "the failure of the government to present evidence to the grand jury which the defendants thought would have been exculpatory" was "wholly without merit." United States v. Thomas, 567 F.2d 638, 642 (5th Cir.), cert. denied sub nom Oliveti v. United States, 439 U.S. 822, 99 S.Ct. 90, 58 L.Ed.2d 114 (1978); see also United States v. Brown, 574 F.2d 1274, 1276 (5th Cir.) ("the Government is under no duty to present to a grand jury evidence bearing on the credibility of witnesses"), cert. denied, 439 U.S. 1046, 99 S.Ct. 720, 58 L.Ed.2d 704 (1978).
 
 
 33
 Second, Drake Williams contends that the district court should have compelled the government to immunize Grossman. This contention is entirely without merit. United States v. Whittington, 783 F.2d 1210, 1219-20 (5th Cir.) ("[I]n the absence of governmental abuse the Court may not direct the government to grant use immunity to a defense witness who invokes the fifth amendment...."), cert. denied, --- U.S. ----, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986).
 
 
 34
 Third, Drake asserts that the trial judge improperly excluded Grossman's DEA statements as hearsay for two reasons: (1) because the government prevented Grossman from testifying by its refusal to honor the immunity agreement; and (2) that the testimony was admissible under Fed.R.Evid. 804(b)(5) (circumstantial guarantees of trustworthiness) and Rule 804(b)(3) (statement against interest). The first assertion falls with Grossman's immunity arguments. The second fails because Drake did not rely on those evidentiary rules in the district court and therefore did not preserve error. United States v. Jackson, 700 F.2d 181, 190 (5th Cir.) ("[A]bsent a showing of manifest injustice, a litigant may not raise a theory on appeal that was not presented to the district court."), cert. denied sub nom Hicks v. United States, 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983). Even had the appellant relied on those evidentiary rules at trial, we find that Grossman's statements would not necessarily have been admissible under either rule. Rule 804(b)(5) is "to be used only rarely, in truly exceptional circumstances." United States v. Thevis, 665 F.2d 616, 629 (5th Cir.) (footnote omitted), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). Drake Williams has not shown that these circumstances are truly exceptional. Rule 804(b)(3) applies only to statements against interest. Grossman made the statements to the DEA under the protection of immunity and therefore they were not statements against his interest. United States v. Gonzalez, 559 F.2d 1271, 1273 (5th Cir.1977).
 
 III. Forum Shopping
 
 35
 Appellants Drake Williams and Meraz contend that the government engaged in forum shopping by dismissing the first indictment in Judge McDonald's court and filing a second indictment five months later. At the defendants' request, Judge McDonald immediately conducted a hearing to ascertain whether the prosecutor acted in bad faith by dismissing the indictment. She found no such bad faith and dismissed the indictment. The second indictment was randomly assigned to Judge DeAnda. He again heard arguments of illicit forum shopping, but denied motions to return the case to Judge McDonald. The appellants contend that the government should have filed a superseding indictment in Judge McDonald's court. Federal Rule of Criminal Procedure 48(a) provides for prosecutorial discretion in dismissing an indictment. "Unless the court finds the prosecutor is clearly motivated by considerations other than his assessment of the public interest, it must grant the motion to dismiss." United States v. Hamm, 659 F.2d 624, 630 (5th Cir.1981) (en banc). No evidence indicates that the district court abused its discretion.
 
 IV. Joinder and Severance
 
 36
 Many of the appellants argue that they deserved separate trials. We first emphasize the general rule that persons who are indicted together should be tried together. United States v. Harrelson, 754 F.2d 1153, 1174 (5th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985). The appellants' arguments assert both prejudicial joinder under Fed.R.Crim.P. 14 and misjoinder under Fed.R.Crim.P. 8. We note the conceptual difference between the two rules. See United States v. Manzella, 782 F.2d 533, 539-40 (5th Cir.), cert. denied sub nom Jimenez v. United States, --- U.S. ----, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986). We address each of the appellants' arguments separately under these two rules.
 
 
 37
 A. Under Federal Rule of Criminal Procedure 14
 
 
 38
 Appellants Drake and Vance Williams, Grossman, and Watson contend that the district court erred in denying their motions for severance. The Federal Rules of Criminal Procedure give the district court discretion to order a severance "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants...." Fed.R.Crim.P. 14. Denials of Rule 14 motions are reviewable only for abuse of discretion. Manzella, 782 F.2d at 540. We can reverse only if the appellant can demonstrate compelling prejudice against which the trial court was unable to afford protection. Harrelson, 754 F.2d at 1174.
 
 1. Need for Testimony
 
 39
 In another attempt to make available Jan Grossman's testimony, Drake Williams asked the district court to sever the two cases. The court refused. To be entitled to a severance, Drake must show (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the co-defendant will in fact testify. United States v. Butler, 611 F.2d 1066, 1071 (5th Cir.), cert. denied sub nom Fazio v. United States, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980). Drake's motion for severance, however, contained only conclusory statements as to the exculpatory nature of Grossman's testimony as well as mere assertions that Grossman would indeed testify. Record, vol. 11 at 1724-27. In addition, the motion was supported by Drake's counsel's affidavit, not an affidavit by Grossman. Id. at 2728-29. In this instance, the trial judge did not abuse his discretion to deny the motion. See United States v. DeSimone, 660 F.2d 532, 539-40 (5th Cir.1981), cert. denied sub nom Butler v. United States, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982).
 
 2. Evidence Against Other Defendants
 
 40
 Drake and Vance Williams are twin brothers. Three witnesses at trial testified that they sometimes found it difficult to distinguish between the two. The Williamses now argue the confusion of identities required the district judge to sever their trials. Relief from this type of prejudicial joinder becomes necessary only when a jury could not be expected to compartmentalize the evidence as it relates to separate defendants. United States v. Lemm, 680 F.2d 1193, 1205 (8th Cir.1982), cert. denied, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983). The two brothers, however, played entirely different roles in the criminal conspiracy: Drake organized the financial aspects of the activities, while Vance participated in the actual distribution. The trial court instructed the jury to consider the evidence against each defendant separately. The jury could easily separate the evidence against the two. Drake and Vance failed to demonstrate that they suffered compelling prejudice, therefore the district court did not abuse its discretion in denying severance on this point. See United States v. DeVeau, 734 F.2d 1023, 1027 (5th Cir.1984), cert. denied sub nom Drobny v. United States, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985).
 
 
 41
 Drake also argues that Vance's prior conviction for narcotics possession increased the prejudice of joinder and therefore mandated severance. We have already held, however, that one brother's conviction does not demonstrate compelling prejudice requiring reversal of a district court's denial of a motion to sever. United States v. Hogan, 763 F.2d 697, 705 (5th Cir.1985). Vance's similar argument that the greater amount of evidence against Drake demonstrates compelling prejudice fails as well. The additional evidence adduced at joint trials does not constitute compelling prejudice by itself. United States v. Sudderth, 681 F.2d 990, 996 (5th Cir.1982). Nor is compelling prejudice assumed because the joint trial was long, the evidence extensive, or the defendants numerous. United States v. Martino, 648 F.2d 367, 385-86 (5th Cir.1981), cert. denied, 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982).
 
 
 42
 Appellant Sahs also argues that the disparity of proof against himself and Drake required severance. The district court gave appropriate limiting instructions to the jury as the trial progressed and in its charge. In addition, the jury returned a split verdict, acquitting defendant Lunday of all counts and defendant Watson of one count. A split verdict indicates that the jury fulfilled its duty to sift through the evidence. United States v. Caballero, 712 F.2d 126, 132 (5th Cir.1983). Although the evidence at this trial was both massive and complex, with proper instructions the jury could separate and apply the evidence. See Manzella, 782 F.2d at 540-41; United States v. Merida, 765 F.2d 1205, 1219 (5th Cir.1985).
 
 3. Evidence of Continuing Criminal Conduct
 
 43
 At the trial, Julia Reinhart testified that defendants Vance Williams and Oscar Silva were dealing drugs with her husband during the trial. Several appellants contend that the evidence of continuing crime by some of the defendants created spillover prejudice that affected the jury's deliberations. The limited testimony did not implicate any of the other defendants. The trial judge specifically instructed the jury to use Ms. Reinhart's testimony as evidence against only Vance Williams and Silva. Record, vol. 28 at 96. We cannot say that the appellants were unable to receive a fair trial because of the testimony. Under the standard of review for Rule 14 severances, we find that the trial court did not abuse its discretion by denying them.
 
 
 44
 4. Joint Representation of Drake and Vance Williams.
 
 
 45
 Drake and Vance Williams moved for severances based on actual conflict of interest that occurred because both were represented by the same counsel at trial. They contend that the joint representation violated their fifth and sixth amendment rights to conflict-free counsel. Both Vance and Drake waived their right to separate counsel after a hearing in conformity with the mandates of United States v. Garcia, 517 F.2d 272 (5th Cir.1975), and Fed.R.Crim.P. 44(c). The trial judge specifically admonished the brothers of the potential for future conflict. The brothers knowingly waived their right, intelligently and voluntarily. The law requires nothing more for a valid waiver. They cannot now argue for a reversal on this ground. United States v. Howton, 688 F.2d 272, 276 (5th Cir.1982).
 
 
 46
 B. Under Federal Rule Criminal Procedure 8(b)
 
 
 47
 Appellant Sahs contends that joinder of defendants involved solely in drug activities with defendants involved in the income concealment scheme violated Fed.R.Crim.P. 8(b).[9] Questions of misjoinder under Rule 8(b) are reviewable on appeal as a matter of law. United States v. Marionneaux, 514 F.2d 1244, 1248 (5th Cir.1975). The indictment charged Sahs in only counts 1 and 2: RICO conspiracy and substantive RICO violations. He was not charged with any of the income concealment activities. Those two charges encompassed eight of the original ten defendants. There is no question that joinder of these defendants was proper under Rule 8(b). The income tax concealment counts were properly tried with the RICO counts as part of a series of acts or transactions. See United States v. Welch, 656 F.2d 1039, 1051 (5th Cir.1981), cert. denied sub nom Cashell v. United States, 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982).
 
 V. Limitation of Cross-Examination
 
 48
 Appellants Silva, Vance Williams, and Meraz contend that the district court's limitation of cross-examination of the government's star witness, Tim Cassias, deprived them of their sixth amendment confrontation right. The trial judge cut off Silva's attempt to impeach Cassias by questions about a previous trial in which Cassias had admittedly committed perjury. The matter had been brought out in open court, however, during earlier cross-examination of Cassias. Restrictions on the scope of cross-examination are within the sound discretion of the trial judge. United States v. Summers, 598 F.2d 450, 460 (5th Cir.1979). In the present case, the jury heard evidence of Cassias's previous perjury; they were exposed to facts from which they could draw inferences as to the unreliability of the witness. Furthermore, the cross-examination of Cassias adequately enabled defense counsel to argue why the jury should disbelieve him. The district court's subsequent limitation of cross-examination did not violate the defendant's sixth amendment rights. See Summers, 598 F.2d at 460-61; United States v. Elliott, 571 F.2d 880, 908 (5th Cir.), cert. denied sub nom Delph v. United States, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).
 
 VI. Judicial Misconduct
 
 49
 The appellants contend that the district judge's conduct and comments during the trial deprived them of their constitutional rights to a fair trial, due process, and the effective representation of counsel. We view these assertions seriously: a trial judge has enormous influence on the jury and therefore must act with a corresponding responsibility. The conduct and comments complained of consist generally of frequent interruptions of and belittling comments regarding defense counsel, limitation of cross-examination, and judicial questioning of the witnesses. In reviewing these claims, we are necessarily limited to the cold black and white of the transcripts. The life of the trial, in which gestures and intonations breathe more subtle meanings into the transcribed words, cannot be presented and escapes us. We must therefore scrutinize the record all the more carefully. The Second Circuit has described the task before us:
 
 
 50
 Our role, however, is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the appellants] a fair, as opposed to a perfect, trial.
 
 
 51
 United States v. Pisani, 773 F.2d 397, 402 (2nd Cir.1985).
 
 
 52
 During this eight-week trial of the original ten defendants, the appellants claim that the district judge interrupted defense counsel over 900 times,[10] while interrupting the government significantly less. A statistical count of court interruptions is pertinent to the inquiry. United States v. Sheldon, 544 F.2d 213, 216 (5th Cir.1976). More pertinent in this case, however, is the nature of the interruptions. The trial involved a 26-count indictment of ten defendants, with 176 government witnesses, that took place over eight weeks. The RICO conspiracy involved complex issues. For such a trial to proceed smoothly, it was necessary for the trial judge to exercise tight control over the presentation of evidence to the jury. Such control is within the broad role of the trial judge as described in Moore v. United States, 598 F.2d 439 (5th Cir.1979):
 
 
 53
 "[t]he trial judge has a duty to conduct the trial carefully, patiently, and impartially. He must be above even the appearance of being partial to the prosecution." On the other hand, a federal judge is not a mere moderator of the proceedings. He is a common law judge having that authority historically exercised by judges in the common law process. He may comment on the evidence, may question witnesses and elicit facts not yet adduced or clarify those previously presented, and may maintain the pace of the trial by interrupting or cutting off counsel as a matter of discretion. Only when the judge's conduct strays from neutrality is the defendant thereby denied a constitutionally fair trial.
 
 
 54
 Id. at 442 (citations omitted) (quoting Herman v. United States, 289 F.2d 362, 365 (5th Cir.), cert. denied, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961)); see also United States v. Adkins, 741 F.2d 744, 747-48 (5th Cir.1984), cert. denied, 471 U.S. 1053, 105 S.Ct. 2113, 85 L.Ed.2d 478 (1985) (quoting Moore ).
 
 
 55
 The trial judge exercised tight control over this trial. He did not allow repetitious questioning by either the defense or prosecution. Before limiting cross-examination, however, he would usually warn the attorney that the line of questioning was repetitious and frequently he would ask what new facts or impeachment the attorney wished to elicit. He did not allow counsel for either side to argue with the witnesses, nor with any of his rulings as to court procedure. Sometimes his manner was abrupt,[11] yet he always allowed the attorney to perfect the record when he ruled against him. At times he treated the prosecutor in the same manner.[12]
 
 
 56
 Most of the conduct complained of by the appellants falls squarely within a federal judge's "wide discretion with respect to the tone and tempo of proceedings before them...." Adkins, 741 F.2d at 747. The judge's questions of the witnesses showed no bias or prejudice, but "sought only to clarify a witness's testimony either for the court, for the jury, or for counsel." United States v. Borchardt, 698 F.2d 697, 700 (5th Cir.1983). In limiting cross-examination, the trial judge acted within "his discretion to interrupt and cutoff counsel's questioning in order to expedite the proceedings and did not make the judge an advocate for the prosecution." Id. The trial court permitted the defense counsel to cross-examine each witness fully. The limitations imposed avoided repetition and excluded irrelevant testimony. These limitations did not deprive counsel of their right to cross-examine witnesses effectively, nor did they imply that the judge favored the prosecution's evidence.
 
 
 57
 Most important to our conclusion that the trial judge maintained the neutrality required of him are the clear and repeated instructions by him to the jury that it was not to consider any questioning or comment by him in its deliberations. In his final instructions, the judge strongly admonished the jury not to consider any of his comments or questions as evidence and specifically not to construe his actions as trial judge as favoring either the government or the defense.[13] These instructions are an important consideration in determining whether the defendants received a fair trial. See United States v. Carpenter, 776 F.2d 1291, 1295-96 (5th Cir.1985); Adkins, 741 F.2d at 748; Borchardt, 698 F.2d at 700; United States v. Middlebrooks, 618 F.2d 273, 277 (5th Cir.), cert. denied, 449 U.S. 984, 101 S.Ct. 401, 66 L.Ed.2d 246 (1980).
 
 
 58
 Some comments, however, may be so prejudicial that even good instructions will not cure the error. Bursten v. United States, 395 F.2d 976, 983 (5th Cir.1968). Some of the comments of the court, made more than once in the presence of the jury, approach the line closely. Some comments made by him in controlling the questioning were sharp indeed[14] and some criticisms of counsel unnecessarily harsh.[15] In determining whether the trial judge overstepped the bounds of acceptable judicial conduct, we must view the proceedings as a whole. Carpenter, 776 F.2d at 1294. Although we regret these comments, after careful examination of the trial record, we cannot say that the incidents complained of deprived the appellants of a fair trial. Overall, the judge conducted this complex trial in an impartial manner.
 
 
 59
 Three particular incidents during the trial are most troubling. The first occurred during the Rosenblath recross-examination by Mr. R.S. Bennett:
 
 
 60
 Q. You wouldn't hire Jude Peterson to do your books today?
 
 
 61
 MR. MAGIDSON: Your Honor, I think we're outside the parameters--
 
 
 62
 THE COURT: I doubt he would hire Drake Williams to do anything today, counsel.
 
 
 63
 MR. R.S. BENNETT: Excuse me, Your Honor. The question was Jude Peterson.
 
 
 64
 THE COURT: Oh, Peterson to do his books today?
 
 
 65
 * * *
 
 
 66
 * * *
 
 
 67
 MR. R.S. BENNETT: If it please the Court, I interpose an objection to the Court's comment about not hiring Drake Williams.
 
 
 68
 THE COURT: I'm sorry. I misunderstood.
 
 
 69
 MR. R.S. BENNETT: Because of the comment by the Court, we move for a mistrial.
 
 
 70
 THE COURT: Oh, you're going to hear more comments than that before it's all over. I'm going to comment on this evidence in my charge. I just didn't understand. I thought you said Drake Williams. I misunderstood him.
 
 
 71
 Record, vol. 18 at 173-74. The judge's interjection, although admittedly occasioned by a misunderstanding, reflects badly on Drake Williams and could be interpreted as the judge's opinion as to Drake Williams's guilt. We conclude, however, that the judge's immediate acknowledgement of his mistake, his later admonishment to the jury to disregard his comments, and the isolated nature of this one sufficiently guarded against prejudicial use of his statement by the jury.
 
 
 72
 The second incident occurred when Judge DeAnda fined Mr. R.S. Bennett $250 for contempt, in front of the jury.[16] A trial judge should not fine a lawyer for contempt before the jury. The risk of prejudice is great with such a strong showing of displeasure. Yet there is no per se rule requiring reversal for such an act. Furthermore, the judge later explained his gruff manners to the jury in a way that minimized the potential for misunderstanding by the jury.[17] Once again, we fail to find any actual prejudice resulting from this unfortunate lapse.
 
 
 73
 In the final incident, the trial judge voiced an aside during the cross-examination of a government DEA agent. Defense counsel had elicited an admission that to work as an informant for the DEA one had to be adept at telling lies.[18] During the questioning the following took place:
 
 
 74
 Q. [by Mr. R.S. Bennett]: [The informant] assumes the role and enters into deception and tells lies, isn't that correct?
 
 
 75
 A. [by Mr. Sims D. Bowers] Okay.
 
 
 76
 THE COURT: Little white lies.
 
 
 77
 THE WITNESS: Little white lies.
 
 
 78
 1st Supp.Record, vol. 9 at 172-73. The Record reflects that the jury laughed out loud at the judge's remark. Record, vol. 19 at 64. The judge explained his comment to counsel the next day outside the presence of the jury as merely cutting off a repetitious line of questioning over a matter not in dispute. Id. The court should not have made such a belittling comment; the proper method to curtail the questioning would have been a direct instruction to the attorney. His "[l]ittle, white lies" comment could be construed by the jury as an expression of the judge's personal opinion. For the same reasons mentioned above, however, we fail to find prejudice from this isolated remark.
 
 
 79
 The court undeniably trod the line of error in various comments during the eight-week trial. We emphasize, however, that it was an eight week one. We conclude that these relatively infrequent incidents, regrettable though they may be, did not deprive the defendants of their rights to a fair trial and effective assistance of counsel. The appellants have not proved that the errors were substantial and that they prejudiced their clients' cases. Carpenter, 776 F.2d at 1294. This case has much in common with the Second Circuit case of United States v. Pisani, 773 F.2d 397 (2nd Cir.1985). We agree with their holding involving similar incidents:
 
 
 80
 Moreover, as serious as some of the incidents are, they occupy but a very small part of this extensive trial record. Most importantly, Judge Edelstein at least partially mitigated the possibly prejudicial impact of his comments by explaining to the jury several times that his admonishments of counsel should have no bearing on their deliberations or determinations. ... Viewing the record as a whole, therefore, we conclude that while some of the trial judge's comments and behavior toward defense counsel were regrettable, they did not convey to the jury an impression of partiality toward the government to such an extent that it became a factor in their deliberations.
 
 
 81
 Id. at 404.
 
 VII. Midtrial Publicity
 
 82
 A month into trial, the government placed Julia Reinhart on the witness stand. Her testimony indicated that defendants Vance Williams and Silva were involved in drug deals even during the trial. The trial judge admitted the evidence over defense objections. Vance Williams and Silva argue that evidence of other crimes was inadmissible under Federal Rules of Evidence 404(b) (evidence of other crimes) or 403 (probative value substantially outweighs the danger of unfair prejudice). To review this argument, "[f]irst it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403." United States v. Beechum, 582 F.2d 898, 911 (5th Cir.1978) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). The government alleged that Vance Williams and Silva worked together closely in distributing marijuana and that this conspiracy continued until at least the date of the indictment. Reinhart's testimony that Vance and Silva were still engaged in such conduct is relevant to the conspiracy issue. The testimony was neither irrelevant nor too remote. "Whatever prejudice there was arose from this firm relevance." United States v. Mortazavi, 702 F.2d 526, 528 (5th Cir.1983).
 
 
 83
 Reinhart's testimony affected defendants Vance Williams and Silva severely. The trial judge revoked their bail and the two were returned to the custody of the United States Marshal. The media covered the indictment extensively: front-page headlines with a color photograph of the two being led away in handcuffs and chained together from the courthouse in one of Houston's daily newspapers,[19] an article of page 27 of the other daily,[20] as well as reports on the local television and radio news programs. Silva immediately requested the judge to individually voir dire the jurors to see if the adverse publicity had affected any of them. The judge denied the request.
 
 
 84
 We recently discussed the issue of midtrial publicity in United States v. Manzella, 782 F.2d 533, 541-44 (5th Cir.), cert. denied sub nom Jimenez v. United States, --- U.S. ----, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986). A court should conduct a voir dire if "serious questions of possible prejudice" arise. To determine if those questions exist,
 
 
 85
 A court must first look at the nature of the news material in question to determine whether it is innately prejudicial; factors such as the timing of the media coverage and its possible effects on legal defenses are to be considered. Second, the court must ascertain the likelihood that the publicity has in fact reached the jury. The prominence of the media coverage and the nature and number of warnings against viewing the coverage become relevant at this stage of the inquiry.
 
 
 86
 Id. at 542 (citing United States v. Herring, 568 F.2d 1099, 1105 (5th Cir.1978)). Herring provides an example of publicity that crossed the first line of inquiry. In Herring, the papers published accounts of threats on the main prosecution witness's life immediately after that witness had testified. This also occurred on the day the defense presented its side of the story. The entire trial lasted only three days and the jury deliberated on the day that the damaging articles appeared. In describing the factors involved in the first step of the analysis, we said: "The critical question here is whether that material 'goes beyond the record ... and raises serious questions of possible prejudice' to the litigants." Herring, 568 F.2d at 1104 (quoting ABA Standards Relating to Fair Trial and Free Press Sec. 3.5(f) (1968)). Although the timing of the publicity was not as harmful in this case, the nature of the material definitely goes beyond the record and raises serious questions of possible prejudice. The act of the judge revoking bail and ordering Vance Williams and Oscar Silva into custody based on Julia Reinhart's testimony places the judge's official imprimatur on the credibility of her testimony. We find that this publicity crosses the initial threshhold.
 
 
 87
 We now must ascertain the likelihood that this publicity actually reached the jury. The factors which we must consider point to opposite conclusions. The media coverage was extensive, including front-page color photographs with accompanying headlines visible at any newspaper vending machine. The jury was not sequestered, and the information was not published in an obscure way. The other factor, however, emphasizes the trial judge's explicit instructions "not to read or listen to anything pertaining to this case." Record, vol. 24 at 252. He gave similar instructions at the close of each day. On the day preceding the particularly damaging publicity, he emphasized his instruction not to listen to outside publicity.[21]
 
 
 88
 The facts in this case fall between those in Herring and those in United States v. Harrelson, 754 F.2d 1153 (5th Cir.1985). We found that the trial judge's instructions in Herring were inadequate. Herring, 568 F.2d at 1101 n. 6. The trial court did not instruct the jury not to examine at all any external information, but only instructed it to disregard that information. Id. at 1105. This was pivotal in deciding that the publicity required the judge to voir dire the jury. The Herring court reversed because of the trial court's failure to do so.
 
 
 89
 In Harrelson, however, despite the extent of the publicity, we determined that the trial judge's instructions adequately shielded the jury from contamination. Yet there we relied upon more extensive instructions and other evidence than that involved in this case. The judge admonished the jury not to read or listen to external news. He also furnished newspapers to the jury from which references to the trial had been stricken. Harrelson, 754 F.2d at 1163. In addition, at the start of trial each day the judge asked the jury if it knew or heard of anything about the case other than from the evidence presented at trial. Furthermore, Harrelson noted:
 
 
 90
 Given the degree of indifference of these particular jurors to the media revealed by the voir dire, ... [the instruction not to read or listen to anything about the trial] was more likely to be effective here than in the ordinary case.
 
 
 91
 Id. at 1164 n. 9.
 
 
 92
 We cannot say that these extra talismans existed in the present case. Upon careful consideration, we conclude that our case more closely parallels Herring than Harrelson. Silva squarely moved for a voir dire of the jury members. It was reversible error for the trial court not to inquire of the possible contamination. We held in Herring that the district court
 
 
 93
 should have examined each juror separately, in the presence of counsel, to determine (1) how much contact the jury members had had with the damaging publicity and (2) how much prejudice to the defendant had resulted from that contact, assuming that any had occurred. For the present, we are unwilling to speculate on the extent of whatever prejudice existed; the point, however, is that since the district court did not question the jury members in order to ascertain the extent of that prejudice, we would have to speculate to conclude that undue prejudice did not exist. In the interests of justice, we must give the defendant the benefit of the doubt in this connection. The state of the record now before us permits no other action.
 
 
 94
 Herring, 568 F.2d at 1106. The conviction of appellant Oscar Silva must be reversed and his case remanded for further proceedings on these grounds.
 
 
 95
 Appellant Vance Williams did not contend on appeal for a reversal for prejudicial publicity. Nor did he adopt the arguments of his co-appellants pursuant to Federal Rules of Appellate Procedure Rule 28(i). We therefore cannot reverse as to him on these grounds. Appellants Grossman, Watson, and Meraz argue that the midtrial publicity prejudiced their defenses as well. The substance of the articles, however, could not be taken as probative of their guilt. They cannot cross the first step of the inquiry. See Manzella, 782 F.2d at 543-44.
 
 
 96
 VIII. The RICO Enterprise Instruction.
 
 
 97
 Six appellants assert that the district court's instruction on the RICO enterprise element was inadequate. The district court's instruction followed the statutory definition of enterprise:
 
 
 98
 [A]n enterprise ... is a group of two or more persons associated in fact, that is, they are united, although not a legal entity such as a corporation or company, that is a group of people that are associated together for a common practice of engaging in a course of conduct.[22]
 
 
 99
 Record, vol. 28 at 99. The appellants timely objected and proffered their own alternative based on the Eighth Circuit's enterprise requirements found in United States v. Bledsoe, 674 F.2d 647 (8th Cir.), cert. denied sub nom Phillips v. United States, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). We had earlier noted the question that this case squarely presents: "Nor do we need to decide whether, as the Court held in [Bledsoe ], it is essential that an enterprise have an ascertainable structure, operate as a continuing unit, and have a goal common to its members." United States v. Cauble, 706 F.2d 1322, 1340 n. 60 (5th Cir.1983), cert. denied, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). We now decide whether a judge must instruct the jury as to these subelements of a RICO enterprise.
 
 
 100
 The instruction given by the district court conforms to the dictates of United States v. Elliott, 571 F.2d 880, 897-99 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Elliott held that the RICO enterprise included entirely illegal informal associations. Id. at 898. The Supreme Court subsequently confirmed Elliott's broad view of the enterprise elements by refusing to restrict the enterprise to only a legitimate business organization. United States v. Turkette, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). The appellants argue, though, that Turkette 's emphasis of the distinctness of the enterprise element requires a more detailed enterprise instruction than the pre-Turkette cases indicated. The Eighth Circuit interpreted Turkette in this light and demanded that a jury find that an enterprise have an "ascertainable structure," a "common goal as to its members," and operate as a "continuing unit." Bledsoe, 674 F.2d at 665. That court also specifically doubted the continued propriety of Elliott. Id. We must turn to the language of Turkette to resolve the question whether Elliott instructions can provide the correct guide to a jury. That decision detailed:
 
 
 101
 That a wholly criminal enterprise comes within the ambit of the statute does not mean that a "pattern of racketeering activity" is an "enterprise." In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C. Sec. 1961(1) (1976 ed., Supp. III). The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity;" it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.
 
 
 102
 Turkette, 452 U.S. at 583, 101 S.Ct. at 2528, 69 L.Ed.2d at 254-55 (footnote omitted). This passage emphasizes that the government must prove both an enterprise and a pattern of racketeering. It reiterates the statutory definition of enterprise: "a group of persons associated together for a common purpose of engaging in a course of conduct." The discussion of the type of evidence that will support the finding of an enterprise does not mandate a standard jury instruction breaking down the elements of an enterprise.
 
 
 103
 The district court complied with both Elliott and Turkette. More than once, the court instructed the jury that they must find both the existence of the enterprise and a pattern of racketeering. See Record, vol. 28 at 99, 111, 113. The judge carefully distinguished these two elements. We hold that his definition of enterprise complied with the standard in this circuit. The court's charge sufficiently distinguished the enterprise and racketeering elements so that the jury could convict only if it had found the existence of both elements.
 
 IX. Sufficiency of the Evidence
 
 104
 Six of the appellants challenge the sufficiency of the evidence on some or all of the counts. "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942). We have closely examined the record in relation to each appellant's assertion. We discuss below only those instances that the evidence presents close questions. In all other instances we have found evidence sufficient to support the convictions.
 
 
 105
 The jury found Tanny Miller guilty of conspiring to make and subscribe false tax returns (26 U.S.C. Sec. 7206(1)) (count 8) and assisting the preparation of a false tax return (26 U.S.C. Sec. 7206(2)) (count 19). He now argues that the evidence was insufficient to support the jury finding. We agree. The government's case against Miller revolves around the exchange of $20,000 cash for a check from a legitimate business for contract labor as part of Drake Williams's laundering scheme.[23] Stephen Rosenblath testified that Drake Williams told him that he had a person "interested in making a cash check swap." 1st Supp.Record, vol. 6 at 213. Rosenblath then sketched-out the contract specifications and gave it to Drake to have him type it up. He also testified that Drake told him the other party was going to be Tanny Miller. A week later, he met with Jude Peterson, received the contract signed by Miller, wrote a $20,000 check to Tanny Miller, and collected his $18,000.[24] Rosenblath testified that he never discussed the transaction with Miller nor was Miller present at any stage of the deal. Record, vol. 18 at 114. Jude Peterson testified that Miller signed the contract in his presence. 1st Supp.Record, vol. 7 at 44. The government also introduced evidence that Miller negotiated the check and that Rosenblath did use the phony contract labor payment in his income tax return.
 
 
 106
 A person need not actually sign or prepare a false tax return to either conspire to or actually aid and abet the filing of a false income tax return. United States v. Wolfson, 573 F.2d 216, 225 (5th Cir.1978). Yet the government must prove that Miller knowingly made the exchange with the expectation that Rosenblath would use it to file a false tax return. See id. The government contends that Miller's expectation can be inferred from the above facts. We disagree. A reasonable minded jury would necessarily entertain a reasonable doubt of Miller's guilt upon these facts. There was no testimony to indicate that Miller knew of the tax-fraud scheme. The testimony showed that the main purpose of the scheme was to help launder drug money. Miller had some money to launder and did so. That he did so with the expectation that Rosenblath would then file a false income tax return is to speculate unreasonably on the evidence. We therefore reverse counts 8 and 19 as to appellant Tanny Miller.
 
 
 107
 Vance Williams challenges the sufficiency of evidence on the RICO investment charge (count 3). This count alleged six overt acts in which Vance participated and from which Vance received income that he then invested in his brother's printing company. The trial judge instructed the jury that the five-year statute of limitations applied to this count in that one of the racketeering acts must have occurred within five years of the date of the indictment.[25] The only act that occurred within that period charged Vance with possession of marijuana in Anthony, New Mexico, in March of 1980. On appeal, the government does not dispute Vance's challenge of that overt act. Instead they point to evidence of other crimes in which the evidence showed Vance participated. Those acts, however, did not go to the jury and they could not have found him guilty of them. The testimony at trial did not indicate that Vance had either actual or constructive possession of that load of marijuana charged in overt act 15 of count 3. We must, therefore, reverse Vance Williams' conviction under count 3 of the indictment.
 
 
 108
 Appellant Orellana challenges his convictions on count 1 (RICO conspiracy) and count 2 (substantive RICO). We find the evidence sufficient to uphold Orellana's conviction under count 1.[26] Count 2 presents a closer issue. The government was required to prove two racketeering acts by Orellana. They alleged only two: receipt of marijuana delivered by Tim Cassias, and a Travel Act violation--interstate travel by Orellana to facilitate marijuana trafficking in violation of 18 U.S.C. Sec. 1952(a)(3). There is substantial evidence of the former act. As to the latter act, Jude Peterson testified that in the spring of 1980 he picked up Orellana at the Austin airport; they went to Watson's house in Marble Falls; they consumed cocaine and marijuana; and that Orellana said he had come to the area for the purpose of meeting Watson. 1st Supp.Record, vol. 7 at 38-40. Orellana challenges only the proof of interstate travel element of the charge. The government also adduced evidence that Orellana resided for years in New England at least up until April of 1980 and that he had no known Texas residence. Although the direct evidence that he travelled interstate is slim, it and the logical inferences that can be drawn from it are sufficient for a reasonable juror to find that Orellana travelled interstate to promote the distribution of drugs. See United States v. Loalza-Vasquez, 735 F.2d 153, 158 (5th Cir.1984).
 
 
 109
 The government does not oppose reversal of Drake Williams's convictions on counts 5 and 6 (concealment of material facts) on the basis of insufficient evidence. We therefore reverse as to those counts.
 
 X. Other Issues
 
 110
 Drake Williams contends that the prosecutor engaged in misconduct by eliciting an improper racial slur attributed to Drake from a government witness. "To warrant a new trial prosecutorial misconduct in the form of improper comment or questioning 'must be so pronounced and persistent that it permeates the entire atmosphere of the trial.' " United States v. Lichenstein, 610 F.2d 1272, 1281 (5th Cir.) (quoting United States v. Blevins, 555 F.2d 1236, 1240 (5th Cir.1977), cert. denied, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978)), cert. denied sub nom Bella v. United States, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980). In this case, it was not the prosecutor, but the trial judge who inadvertently elicited the statement; it was one remark in an eight-week trial; and the court issued a curative instruction. We find no reversible error.
 
 
 111
 Drake argues that the RICO language of "narcotic or other dangerous drugs" did not give him fair notice of the inclusion of marijuana within the RICO statutory scheme because it did not define "other dangerous drug." Marijuana is a Schedule I controlled substance and therefore falls within the ambit of RICO. United States v. Phillips, 664 F.2d 971, 1039-40 (5th Cir.1981), cert. denied sub nom Meinster v. United States, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Because of the federal government's treatment of marijuana, the RICO statute gives a person of ordinary intelligence fair notice that marijuana is included as a dangerous drug. See United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954).
 
 
 112
 Drake also asserts that his convictions for drug offenses under 21 U.S.C. Secs. 846 (conspiracy to distribute cocaine) (count 9) and 848 (continuing criminal enterprise) (count 4) and his RICO conspiracy conviction (count 1) are the same offenses for double jeopardy purposes. We have already held otherwise. See United States v. Erwin, 793 F.2d 656, 659 (5th Cir.1986) (RICO and continuing criminal enterprise violations are separate); United States v. Smith, 574 F.2d 308, 311 (5th Cir.) (21 U.S.C. Sec. 846 conspiracy and RICO conspiracy are separate offenses), cert. denied, 439 U.S. 931, 99 S.Ct. 321, 58 L.Ed.2d 325 (1978).
 
 
 113
 Drake also challenges the jury's verdict to forfeit certain of his assets pursuant to 18 U.S.C. Sec. 1963(c) and 21 U.S.C. Sec. 853(a). The jury returned a special verdict forfeiting 15 of 18 items presented by the government. Drake asserts that such a split verdict is inconsistent with the determination of his guilt: either he engaged in racketeering activities and all of the items must be forfeited, or he was not and none of the items should be forfeited. This argument has no legal support. The district court correctly instructed the jury on forfeiture after the guilty verdict. See United States v. Cauble, 706 F.2d 1322, 1348 (5th Cir.1983), cert. denied, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). The Court in United States v. Grammatikos, 633 F.2d 1013, 1024 (2nd Cir.1980), upheld the forfeiture of two of the nine items from the government list. Furthermore, there is nothing inherent in the RICO statute that forbids the jury from finding those items that represent the defendant's interest in the enterprise. "What the jury did with the remaining counts is immaterial." United States v. Michel, 588 F.2d 986, 997 (5th Cir.), cert. denied, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979).
 
 
 114
 We have carefully reviewed the appellants' remaining arguments, which included claimed errors as to continuances, sealing of tapes, and jury instructions and find them without merit.
 
 Conclusion
 
 115
 Although the district court's trial of appellants was not perfect, it was fair. In accordance with the above discussion, we AFFIRM the appellants' convictions except as to those of Oscar Silva, which we REVERSE and whose case we REMAND for further proceedings; to Vance Williams, whose conviction on count 3 we REVERSE and VACATE; to Tanny Miller, whose convictions on counts 8 and 19 we REVERSE and VACATE; and as to Drake Williams, whose convictions on counts 5 and 6 we REVERSE and VACATE.
 
 
 
 *
 District Judge of the Western District of Louisiana, sitting by designation
 
 
 [1]
 Drake and Vance Williams are identical twins
 
 
 [2]
 Record, vol. 12 at 2905 (Silva) ("the Government will ... move to dismiss the original indictment"); id. at 3029 (Sahs) ("the Government will move to dismiss the remaining counts of the indictment"); Meraz Exhibit 3 (Meraz) ("the Government will ... move to dismiss the original indictment")
 
 
 [3]
 Bock's testimony was not the paradigm of clarity. He admitted that it was his "honest belief" that Silva would not be indicted in the Southern District, and that he might have imparted that assumption to Silva's counsel. Yet he was adamant that he imparted only his "opinion" to counsel and that he "had no idea what the investigation in Houston was." Record, vol. 16 at 127-31
 
 
 [4]
 To be sure, the fact that the original Southern District indictment was returned omitting Meraz as a defendant does offer support to Meraz's version of the promise. We must apply, however, the clearly erroneous standard to the trial court's findings
 
 
 [5]
 18 U.S.C. Sec. 6002 permits the government to grant use immunity whenever a witness refuses to testify before, among others, "an agency of the United States." A person receiving statutory use immunity may not then refuse to testify
 on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.
 
 
 [6]
 The first Houston indictment was dismissed after the hearing on Grossman's motion, but before Judge McDonald's ruling on the motion. The parties agreed to use the transcripts of that hearing for purposes of Grossman's motion in the present trial
 
 
 [7]
 The last sentence of the consent agreement read:
 However, it is understood that all statements are given pursuant to the immunity agreement between the United States Government and Jan Grossman.
 Record, vol. 13 at 3155.
 
 
 [8]
 The government cited two cases in support of its statement of the law: United States v. Sanderson, 498 F.Supp. 273 (M.D.Fla.1980) and United States v. Pellon, 475 F.Supp. 467, 479 (S.D.N.Y.1979), aff'd, 620 F.2d 286 (2nd Cir.), cert. denied, 446 U.S. 983, 100 S.Ct. 2963, 64 L.Ed.2d 839 (1980)
 
 
 [9]
 Fed.R.Crim.P. 8(b) provides in part:
 Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.
 
 
 [10]
 Not all interruptions were derogatory or harmed the appellants' presentation of their cases. Many were, in fact, helpful. During the cross-examination of one irrascible witness, Judge DeAnda took over the questioning and elicited the answers that the witness had refused to give the defense counsel. Record, vol. 22 at 56-59
 
 
 [11]
 At the beginning of the trial, after an argumentative question by one of the defense counsel, Judge DeAnda said, "Let me tell you right now, Mr. DeGuerin, you haven't tried a case before me, I don't believe, but I do not tolerate that at all. You're going to conduct the cross-examination in the proper manner or we're going to have some problems." 1st Supp.Record, vol. 4 at 175
 
 
 [12]
 Some of the judge's comments to the prosecutor showed the same brusque manner of which the appellants complain. At one point, after the trial court admitted a defense exhibit, the prosecutor belatedly said that he had no objection. Judge DeAnda quickly responded, "I'm glad you didn't because I already admitted it." Record, vol. 40 at 303. Another time, after an early objection by the prosecutor, the trial court commented:
 THE COURT: The only trouble with your objections, they come before he asks the question.
 MR. MAGIDSON [prosecutor]: I object to the first part.
 THE COURT: I admire you for your ability for being able to tell what's going to happen. I don't have the same ability. Wait until he finishes the question, then make the objection.
 1st Supp.Record, Vol. 4 at 242.
 
 
 [13]
 The court instructed the jury as follows:
 During the course of this trial, jurors, I had occasion to rule on objections. I've had occasions sometimes to admonish the lawyers. In one instance I even fined Mr. Bennett. The fact I did these things should in no way be construed by you as any feeling I might have in the case one way or the other. I rule on the objections of the lawyers the way I think the law requires me to rule. Sometimes I rule in favor of the Government, sometimes in favor of the Defense, sometimes in favor of neither, from the reaction I get, but I don't do that with the idea and I do not want to leave the impression, that I wish one side would prevail over the other because I certainly did not do that. If I did you have every right to resent it because I'm not on the jury. You see, jurors, you can't tell me what the law is. I tell you that and you have to accept it. I can't tell you what the facts are because that's your job and that's the way our system works. It works very well. So--also during the course of the trial I've had occasion perhaps to ask witnesses questions because I may not have heard something a witness said or I could not understand clearly what the import of the witness's testimony was and I want to clarify so I might be able to give you a charge, based on the evidence, but when I ask a witness a question, I believe I mentioned this earlier, it's not because I believe what the witness is going to answer or because I disbelieve what the witness is going to answer. When I ask a witness a question, jurors, I simply do it with this purpose in mind, and that is you hear the answer to my question then you decide whether that answer is truthful or not or accurate or not and whether it helps you or not. That is my sole reason that I have for asking witnesses questions. So, do not assume from anything I have said or any action on my part that I have any opinion in this case, because I do not. That's for you to decide. I will have an opinion in this case when you return a verdict and I will assure you that my opinion will coincide with yours, it always does because I think twelve persons sitting in the privacy of a jury room and discussing the evidence and reviewing it come out with the right answer, time and again. They overlook nothing, forget nothing and are fooled by no one.
 Record, vol. 28 at 87-88.
 
 
 [14]
 Q. [by MR. DeGUERIN] Is that what qualified you to become a confidential informant?
 THE COURT: That's argumentative, counsel, please why don't we start asking something about this case now.
 MR. DeGUERIN: It's about his credibility as a witness.
 THE COURT: I haven't heard anything from you yet, Mr. DeGuerin. Get off that and go to something else.
 1st Supp.Record, vol. 4 at 189-90.
 MR. COLLINS: May I pursue this?
 THE COURT: I wish somebody would catch something instead of so much pursuit. Go ahead.
 Id. at 221.
 
 
 [15]
 Q. [by MR. R.S. BENNETT] Mr. Cassias, you would agree with me, you would agree with me it was only after you had lunch with the Government that you come back and identified Mr. Orellana, isn't that correct?
 THE COURT: I think it's an absurd question, counsel.
 Don't answer it.
 Q. The Government told you to come back in to the courtroom after lunch and identify Mr. Orellana, isn't that correct?
 A. No, sir, that's not correct.
 Q. They talked to you about the fact that you left out Mr. Orellana, isn't that right?
 A. No, sir, they did not.
 Q. You brought up the fact you needed to name some other people and you came back and named Mr. Orellana, isn't that correct?
 MR. MAGIDSON: I object.
 THE COURT: Sustain the objection. He was answering the question asked him when he identified Mr. Orellana, counsel. I think the jury is aware of all that. That is an unwarranted attack of the Government and the jury is not to consider it. Sometimes the tactics of lawyers is to throw a smoke screen from the facts and inject in the case questions for which there's absolutely no basis.
 MR. DeGUERIN: I object.
 THE COURT: Let me finish and you can object. Be seated.
 That happens sometimes during cases, jurors, and that's why I told you earlier that the question of a lawyer is never evidence in the case. It's the answer the witness gives.
 Now you may indicate your objection.
 1st Supp.Record, vol. 5 at 8-9.
 THE COURT: Don't argue with the witness. Just ask questions.
 MR. R.S. BENNETT: I apologize.
 THE COURT: I wish you'd stop apologizing so much and don't do something you have to apologize for.
 MR. R.S. BENNETT: I'm trying to represent my client.
 THE COURT: You can represent your client under the rules, I don't think that's asking too much.
 1st Supp.Record, vol. 7 at 172.
 MR. R.S. BENNETT: Excuse me, Your Honor, I respectfully object to the Court now taking the cross-examination and ask the Court not to continue so that I may afford effective assistance of counsel and continue to examine him on that.
 THE COURT: You can when I finish. I'll overrule your objection. You tried, I gave you a chance and you weren't doing too well.
 Id. at 110-11.
 
 
 [16]
 The contempt fine occurred during the following exchange:
 MR. MAGIDSON: I object. He's already answered that.
 MR. R.S. BENNETT: Your Honor, he said--
 THE COURT: Sustain the objection.
 MR. R.S. BENNETT: But Your Honor--
 THE COURT: Sustain the objection. Just have a seat and ask your next question. Do not argue with me again during this trial.
 MR. R.S. BENNETT: I apologize.
 THE COURT: Don't apologize, don't argue anymore. And that's going to cost you two hundred and fifty dollars for disobeying my orders. I told you to quit arguing with me.
 1st Supp.Record, vol. 7 at 155.
 
 
 [17]
 At the end of trial on a Friday afternoon, Judge DeAnda made the following speech to the jury:
 I started to say tomorrow.
 I had my heart set on working tomorrow. We'll--Mr. DeGuerin, I smiled again, but--
 MR. DeGUERIN: I was smiling at that, too. I want to work tomorrow.
 THE COURT: Well, see, Mr. DeGuerin chides me occasionally because I smile or some mannerism.
 And jurors, let me say if I have, during the course of this trial, smiled many times, you know, it's just in my nature to smile, and sometimes I frown and--
 MR. DeGUERIN: Only at me, Your Honor.
 THE COURT: Well, I think others share equal billing with you, Mr. DeGuerin.
 When I do that, I don't take it to intend any impression, leave any impression with you about how I feel about a witness' testimony or a witness's credibility, or the witness' case or the witness' side.
 I think I smile during both sides, but that's not my purpose.
 And so, don't--I do not, in any way, want to infringe upon your duties and your responsibilities; so, please, do not take any mannerism of mine--I've even been criticized for throwing a pencil down once and I throw pencils down about half a dozen times a day, but don't take that as any impression that I'm for or against anybody.
 Sometimes I get angry with lawyers, but never with clients, never in my whole life have I ever gotten angry with a client, with a party or with a juror.
 I save my anger for the lawyers, just as they do for me sometimes.
 So, do not take that as any reflection on anyone here, all right?
 Record, vol. 44 at 260-61.
 
 
 [18]
 This would aid in the impeachment of Tim Cassias, the government's star witness and an informer for the DEA
 
 
 [19]
 The Houston Post carried the color photograph with the caption: "Silva, left, and Williams leave Federal Building in chains." The article beneath the photograph was titled: "Rackets Trial 'Bombshell': Drug deals continue: witness." The article began on page one and continued on page three. It summarized Julia Reinhart's testimony before the judge outside the presence of the jury. The following day the Post ran an article on page 16A in which it quoted the trial judge saying "I'm outraged by this conduct."
 
 
 [20]
 On page 27 of its first section, the Houston Chronicle ran an article titled: "Judge jails 2 suspects in narcotics trial after hearing testimony." It detailed the judge's decision to revoke bail as well as briefly summarizing Reinhart's testimony
 
 
 [21]
 The judge instructed the jury as follows:
 ... I anticipate there will be continued publicity about this case in the media. So, I'm going to ask you one more time and remind you one more time of your commitment not to expose yourself to any extraneous matters, not to listen to anything on the T.V. about the case nor read anything about it in the newspapers. I'm confident you will comply with my instructions which will enable you to reach a verdict in this case based on what you hear in the courtroom.
 Record, vol. 23 at 228-29.
 
 
 [22]
 The statutory definition reads:
 "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity....
 18 U.S.C. Sec. 1961(4).
 
 
 [23]
 Stephen Rosenblath, an unindicted co-conspirator, owned a successful landscaping business and employed Drake as his accountant. Because of his high taxes Drake suggested that Rosenblath exchange company checks for cash and enter the transaction into his books as a tax-deductible contract labor payment. Rosenblath agreed to this scheme
 
 
 [24]
 Drake Williams charged a ten percent fee for these transactions
 
 
 [25]
 We do not necessarily agree that this is a correct statement of the law. The government argues that if any act of investment occurs within five years, then the statute of limitations is met. We need not decide this issue here because the government did not object to the district court's instructions. They cannot now raise this issue on appeal
 
 
 [26]
 Because we find the evidence sufficient to show that Orellana agreed to personally commit at least two racketeering acts, we need not reach the question whether conviction under a Sec. 1962(d) conspiracy to violate Sec. 1962(c) requires agreement of the individual to personally commit two racketeering acts as opposed to an agreement that the enterprise commit two racketeering acts. For an excellent discussion of this question, see United States v. Neapolitan, 791 F.2d 489, 494-500 (7th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986) (holding that RICO requires only the latter)